**Jerome Simons, et al., Plaintiffs-Appellees, v. Work of God Corporation, Defendant-Appellant.**

**Gen. No. 48,279.**

First District, First Division.

June 4, 1962.

Rehearing denied July 30, 1962.

Brundage & Short, and Kirkland, Ellis, Hodson, Chaffetz & Masters, all of Chicago (Narcisse A. Brown, Thomas F. Scully and Joseph H. Pleck, of counsel), for appellant.

Arvey, Hodes & Mantynband, of Chicago (Louis M. Mantynband, J. Herzl Segal, and Edwin A. Wahlen, of counsel), for appellees.

MR. JUSTICE BURMAN delivered the opinion of the court.

The sole question presented by this appeal is whether the Circuit Court correctly construed a restrictive land covenant appearing in defendant's deed. The decree of the trial court permanently enjoined defendant from using its residence at 854 Castlewood Terrace, Chicago, "for any purpose other than the residence of one single family consisting only of persons related each to the others by blood or marriage and keeping house as one single housekeeping unit."

Defendant is an Illinois not-for-profit eleemosynary corporation whose purpose is "to foster religious and cultural development of men and women; to teach the application of Christian principles to everyday life; to promote Christian morals and benevolence." Pursuant to this corporate purpose defendant purchased several residences in Chicago and furnishes residential and other facilities to members of Opus Dei, a secular institute of the Roman Catholic Church whose members dedicate their lives to God by seeking professional perfection in the modern world. On December 22, 1958, defendant purchased the house and lot at 854 Castlewood Terrace for $36,000. Five members of Opus Dei occupy the residence as their home: two are accountants, two are priests, and one a retired physicist.

In 1896 certain negative reciprocal covenants were imposed by deed upon the purchasers of the lots facing Castlewood Terrace. Those covenants appear in defendant's deed and read, in part, as follows:

3. That not more than one building to be used for a dwelling shall at any time be erected or maintained upon the lot above described.

4. That no apartment or flat-building or structure built, *used or adapted for the separate housekeeping of more than one family* shall at any

202

time be built *or maintained* upon said lot. (Emphasis added.)

Twelve resident property-owners in the Castlewood subdivision filed a complaint alleging that defendant, with knowledge of the covenants, was occupying the premises for the use and promotion of its religious activities in violation of the restrictions. The issues were submitted to the trial court on stipulation that all issues were to be determined on the pleadings, documents, photographs, depositions, briefs and oral argument.

Castlewood subdivision is bounded on the west by Sheridan Road, on the east by Marine Drive (formerly by Lake Michigan), on the north by Ainslie Street, and on the south by Gunnison Street (formerly LaFayette Parkway). Castlewood Terrace is a public street bisecting the subdivision in an east-west direction from Sheridan Road to Marine Drive. No north-south streets run through the subdivision. Twenty-one lots, each 50 feet in width, face each side of Castlewood Terrace.

It was stipulated at trial that the validity of the covenants in this subdivision has been upheld in Cuneo v. Chicago Title & Trust Co., 337 Ill 589, 169 NE 760; Kruetgen v. General Outdoor Advertising Co., 288 Ill App 619, 6 NE2d 469; and Circuit Court of Cook County cases Kruetgen v. Hyde, No. 40C7967; and Miles et al. v. Northern Trust Co., No. 49C8640.

It was further stipulated that none of the five persons residing in defendant's house is related by blood, marriage or any degree of kinship to any of the other of said five persons. Attached to the stipulation were photographs of plaintiffs' homes, a statement of their values, and description of their use.

The Chancellor's decree, entered on July 14th, 1960, stated that the use of the property "is limited to one building to be used as a dwelling, containing only one

203

housekeeping unit used by only a single family." Holding that the five members of Opus Dei "are not a 'family' as that word is used in said restrictive covenants," the decree enjoined defendant in the manner above mentioned.

Defendant argues initially that the entire purpose of the fourth restriction is to prevent the erection of, or the conversion of a single housekeeping unit building to, a building containing multiple housekeeping and living units. Our attention is called to Cuneo v. Chicago Title & Trust Co., 337 Ill 589, 598, 169 NE 760, where it is stated:

> The evident purpose of these restrictions on the property abutting on Castlewood Terrace . . . was and is to preserve the lots facing on Castlewood Terrace as a residence district.

Pointing out that it maintains only a single housekeeping unit, used solely for residence purposes, defendant contends that there as been no violation of the restriction.

We cannot take so limited a view of the fourth restriction. Defendant's interpretation would require us to consider the phrase "of more than one family" as meaningless superfluity. Neither the rules of construction nor the clear intent of the creator of the restrictions will permit us so to do. Our courts have often employed the maxim that in the construction of deeds effect must be given, if possible, to every clause and word used by the parties. (Woods v. Seymour, 350 Ill 493, 183 NE 458; Shell Oil Co., Inc. v. Moore, 382 Ill 556, 560, 48 NE2d 400.) No term employed, in the absence of conflicting recitals and if consistent with law and public policy, may be rejected as meaningless or surplusage. (Henry v. Metz, 382 Ill 297, 300, 46 NE2d 945.)

204

Had the parties to the restriction intended the meaning advanced by defendant it seems that the fourth restriction would have been drafted to read something like "no apartment or flat-building or structure built, used or adapted for more than one housekeeping or living unit. . . ." Instead, the limitation was very carefully drawn in terms of "the separate housekeeping of more than one family." We think the fundamental purpose of this restriction is, first, to limit each structure to one housekeeping unit, and second, to limit the use of that housekeeping unit to but one family.

Defendant's interpretation would make it possible for an unlimited number of families to live in any of the houses on Castlewood Terrace so long as they maintain a single housekeeping unit. From the language of the restriction and the surrounding circumstances it is clear to us that such a possibility was never intended. For the same reason defendant's related contention that the fourth restriction is merely a building restriction and not a use restriction must be rejected. This interpretation would leave totally unrestricted the use to be made of any structure on Castlewood Terrace once the construction of such edifice is completed.

Defendant argues in the alternative that the occupancy of its premises by the five members of Opus Dei constitutes a valid use of the property even if the fourth clause of the restriction is construed to limit occupancy to one family, because the current residents comprise a family within the meaning of the restriction. In other words, defendant claims the trial court erred in limiting the concept of a family to persons related each to the other by blood or marriage (plus domestic servants).

Defendant's house can accommodate about ten or twelve permanent residents. It contains seven bed-

205

rooms, a living room, and a large ballroom currently in poor condition. Among the numerous rooms in the basement are a kitchen and a dining room. The old dining room on the first floor has been converted into a chapel where daily private masses are held solely for the residents. The five members of Opus Dei currently occupy four of the bedrooms. They are free to move out at any time. The admission of other members of Opus Dei as new residents would require the mutual consent of the existing residents.

Three of the current residents have no regular monetary income. The remaining two, in accordance with vows of poverty, deposit their entire net salaries in a joint bank account from which are paid all of the expenses for clothing, transportation and other necessities for each resident, as well as the operating expenses of defendant's house, including food, utilities, heat and domestic help. The mortgage payments on the residence, the furnishings in the house, and any remodeling or redecorating, are taken care of by defendant corporation. The bank account is in the name of three of the residents and withdrawals require the signatures of two of the residents. Household decisions and questions as to the personal needs of any of the residents are determined by an informal vote of the five residents, a majority governing and no one person having the final voice on any matter. Even the vice president of the defendant corporation was not certain "who runs the house."

■ It is our view that this group occupancy and cooperative management of the house, without a head of the household, by persons related by neither blood nor marriage, constitutes a use of the property forbidden by clause four of the deed. We are convinced that the framer of the restriction used the word "family" in its ordinary, popular sense, connoting a natural fundamental unit of our society. Generally

206

speaking, this fundamental unit is composed of a father, mother, children, and possibly others related by blood or marriage (servants excepted), who make one home together with a natural head of the family.

■ ■ In placing a construction upon the clause in question we must also look to the surrounding circumstances, if in them there is any evidence to indicate the construction placed on the words by the parties in the deed. (Williams v. Swango, 365 Ill 549, 7 NE2d 306; Henry v. Metz, 382 Ill 297, 46 NE2d 945.) The history of the Castlewood subdivision, as evidenced by the affidavits of each plaintiff and the discussion in Cuneo v. Chicago Title & Trust Co., 337 Ill 589, 169 NE 760 and Kruetgen v. General Outdoor Advertising Co., 288 Ill App 619, 6 NE2d 469, reveals that each structure on Castlewood Terrace, with the exception now created by defendant, has from its inception been used exclusively as a residence by a natural family and, in some instances, its domestic servants. To us this is a clear manifestation of the intent of the parties to the restriction, an intent which has been uniformly and steadfastly perpetuated throughout the years.

We are not attempting to lay down a yardstick for the determination of what constitutes a family. That is not incumbent upon us under the facts of this case. And we are quite aware of the variations which often develop from the basic unit we have described. Yet we do not feel that the term "one family" can be stretched to include the circumstance of ownership by a non-profit corporation and occupancy by five or more unrelated adults living together under group self-management.

■ Defendant calls our attention to the definition of "family" appearing in Village of Riverside v. Reagan, 270 Ill App 355, 365:

207

In the Century Dictionary the word "family" is defined as:

"The collective body of persons who form one household under one head and one domestic government, including parents, children, servants and as sometimes used even lodgers or boarders."

In Webster's dictionary the definition is:

"The collective body of persons who live in one house, and under one head or manager; a household, including parents, children and servants, and, as the case may be, lodgers or boarders."

The Riverside case also cites with approval the language of Race v. Oldridge, 90 Ill 250, 252, where the court, after reciting the various dictionary definitions of "family," stated:

Thus, it is seen that the word has a broad and comprehensive meaning in general use. Bouvier says, the word has a restricted sense, which only includes the father, mother and children; but in a more enlarged sense it includes all individuals who live under the authority of another, and includes the servants of a family. Thus, it is seen, its legal meaning differs but little from its general acceptance.

The significance of the definitions above does not lie in their encompassing an incidental boarder or person not related to the others by blood or marriage. Courts have readily treated such an incidental dweller as being a part of a "family." (See Southampton Civil Club v. Couch (Tex), 322 SW2d 516 and authorities cited therein.) What *is* noteworthy about the foregoing definitions, however, is the acknowledgment in each instance that the entire concept of a family is centered around a nucleus composed of a father,

mother, and children with one head of the household. No definition has come to our attention which suggests that the concept of a family is commonly thought to include a collection of unrelated adults living under democratic group management. We repeat, this discussion of definitions is not for the sake of determining a judicial concept of the "family," but rather is directed to the narrow question of whether the group under consideration comes within the meaning of that word as used in the restrictive covenant.

We cannot agree with defendant that Boston-Edison Protective Ass'n v. Paulist Fathers, 306 Mich 253, 10 NW2d 847 is authority for the position defendant takes here. The Supreme Court of Michigan rejected in that case the plaintiffs' contention that the restriction limited occupancy of the residence "to persons of one (and the same) family, i. e., persons related to each other by blood or marriage," and held that use of the dwelling house solely as a residence for five Roman Catholic priests and their two servants was not a breach of the covenants. The factor distinguishing Boston-Edison from the instant case is the language of the restriction appearing in the former. It prohibited the use of the property "except for a single dwelling house and dwelling house purposes only." The term "single dwelling house" accomplishes the same result as the term "separate housekeeping" in the restriction before us. But there was no further limitation in the Boston-Edison covenant confining the residential use of that single dwelling house to not "more than one family." The Michigan Court thus did not speak to the question before us.

Likewise, Missionaries of Our Lady of La Salette v. Village of Whitefish Bay, 267 Wis 609, 66 NW2d 627, cited by defendant, is of no help in determining the question before us. The conclusion of the Wisconsin Court in that case that three Roman Catholic priests

and two lay brothers constituted a "family" within the letter and spirit of the ordinance under consideration was facilitated by the ordinance itself which defined a family as "one or more individuals living, sleeping, cooking, or eating on premises as a single housekeeping unit." The Wisconsin legislature obviously had determined for the purposes of that ordinance the very matter which is the issue before us.

The reasoning in Seeley v. Phi Sigma Delta House Corp., 245 Mich 252, 222 NW 180, lends support to our view even though its precise holding is not controlling here. The Michigan Supreme Court there held the attempt by a college fraternity to erect a house for its members on property restricted by a covenant limiting its use to "one single private dwelling house" to be in violation of the restriction. Construing the restriction to intend "a building designed as a single dwelling to be used by one family," the court stated, at page 181:

> A college fraternity may assume some attributes characteristic of a natural family relation, but does so for the comfort of the members and for a convenience of management, and it is obvious that the relation is purely artificial, is a business proposition, and more nearly approximates the character of a club, boarding house, or apartment house, with added recreational privileges, than a family.

It seems to us that substantially the same observations can be made concerning the residents of defendant's house. Though they are bound together by strong religious principles and for a noble purpose, their occupancy is nevertheless a business proposition, designed for convenience of management, and assumes the nature of a boarding house or private club rather than that of a family.

The court was not swayed in Phi Sigma Delta, by the fact that only one kitchen and one dining room would be used by the fraternity. Moreover, the opinion, at page 182, articulates the novelty of cases involving negative reciprocal covenants:

Definitions adopted for legislative purposes in housing codes and zoning ordinances cannot be employed in interpreting or construing a restrictive covenant running with the land. The purpose of the restrictive covenant in the case at bar was to maintain the quiet, the privacy, and the family character of a residential district.

██ ██ In reaching our decision we have not ignored the general rule, urged by defendant, to the effect that whenever a restrictive covenant is involved all doubts and ambiguities should be resolved in favor of natural rights and against restrictions. (Hutchinson v. Ulrich, 145 Ill 336, 34 NE 556; Ewertsen v. Gerstenberg, 186 Ill 344, 57 NE 1051; O'Gallagher v. Lockhart, 263 Ill 489, 105 NE 295; Postal Tel. Cable Co. v. Western Union Tel. Co., 155 Ill 335, 40 NE 587; Staley v. Mears, 13 Ill App2d 451, 142 NE2d 835.) In our opinion, the language "separate houskeeping" of not "more than one family" is neither unclear nor susceptible equally to more than one interpretation. Calling to mind again the pattern of residential use that has been maintained continuously since the origin of the restrictions, it is clear that none of the parties to the covenants has ever been uncertain as to the meaning, either. The rule favoring a free use of property and demanding that such restrictions be confined to all reasonable limits consistent with the language used does not justify our rendering meaningless the lawful, reasonable and unambiguous restriction before us. "Where the intention is clearly shown by the restriction, and the enforcement of such restriction

211

is necessary for the protection of substantial rights, they will be enforced." Cuneo v. Chicago Title & Trust Co., 337 Ill 589, 595, 169 NE 760.

██ The admonition of the Michigan Court in Boston-Edison Protective Ass'n v. Paulist Fathers, 306 Mich 253, 10 NW2d 847, 849 bears repeating here:

> It is obvious that each case involving the construction of reciprocal negative easements must be decided on its merits, considering the facts of the case. As said by Mr. Justice Wiest in Hamburger v. Kramp, 268 Mich 611, 256 NW 566: "Building restriction cases are governed by particular facts, and it is neither possible nor desirable to establish a measuring stick and thereafter cut cases to fit, for that would be too Procrustean."

Under the facts and circumstances before us we hold that defendant's use of its property on Castlewood Terrace as a residence for members of Opus Dei is a violation of the restrictive covenants appearing in defendant's deed, and therefore was properly enjoined. Accordingly, the decree of the Circuit Court is affirmed.

Affirmed.

MURPHY, P. J., concurs.

MR. JUSTICE ENGLISH, dissenting:

I agree with the majority that all doubts and ambiguities in the interpretation of restrictive covenants "must be resolved in favor of natural rights and against restrictions."

I agree, too, that in construing the language of the deed we must give effect, if possible, to all clauses

of the restriction; such as "separate housekeeping of more than one family."

I agree, also, that the first and "fundamental purpose" of the restriction is "to limit each structure to one housekeeping unit."

In our conclusions we differ, however, for I believe that the majority departs from all three of these principles which it purports to accept.

The language we are to construe is that "no apartment or flat-building or structure . . . used . . . for the separate housekeeping of more than one family shall ever be . . . maintained on any lot."

I would consider it clear that the general purpose as conceived by the draftsman in 1896 was to rule out the type of buildings which were then being erected extensively in this city for the housing of multiple housekeeping facilities, called "apartments" or "flats." The word, "structure," as here used, adds little, as it takes its meaning by absorption from the other two words.

If we are to apply the principles stated above, this restriction does not proscribe use of the building in a single housekeeping unit by any number of persons or families. If the course of events 65 years later indicates that it would or might have been desirable to have drawn the restriction differently, that is not our problem. We must consider the words as written, and they do not, in my opinion, limit the number of families so long as a single housekeeping unit is maintained. To support the majority's conclusion on its own terms, the words of the restriction would have to be changed

from "for *the* separate housekeeping *of* more than one family"

to "for separate housekeeping *or* more than one family," or words to that effect.

213

And that is essentially one of the changes which was made by the decree from which this appeal has been taken.

Even if we were to ignore the "separate housekeeping" provision (as the majority apparently does), we would still be faced with the words, "more than one family," and the only possible basis for the injunction in this case would then be that defendant's occupancy of the premises constitutes use by "more than one family."

Bearing in mind that restrictive "covenants will be construed with the *utmost strictness,* to the end that the restraint shall not be extended beyond the express stipulation," (Postal Tel. Cable Co. v. Western Union Tel. Co., 155 Ill 335, 348, 40 NE 587) it should be noted that the words in question do not require that the premises be occupied by a family at all, although it would have been simple to impose such a limitation. As stated in Leverich v. Roy, 338 Ill App 248, 254, 87 NE2d 226, "If the construction contended for . . . were intended it would have been very easy to have said that the property was to be used as a one family residence only." *

Both the chancellor and the majority here, have decided that the persons occupying the premises on behalf of defendant "are not a 'family' as that word is used in said restrictive covenants." ** Applying to this finding, the words of the proscription against use by "more than one family," I fail to see how the restriction is violated through use by no family at all; or how *"less than one"* can be *"more than one."*

---

* In the Leverich case, the restriction limited use of the land to "one dwelling house" or one "private dwelling house." It was held that these words did not prohibit use as a two-family apartment building, citing Hutchinson v. Ulrich, 145 Ill 336.

** This quotation is from the decree.

214

This is without considering defendant's contention that the occupants of the premises do constitute a "family" and the cases it has cited in support, some of which are quite persuasive. In stating its conclusions on this point, the majority repeatedly forswears the writing of a definition of the word, "family," and yet it does so inferentially by affirming the decree which does so specifically.

In my opinion, the restriction as redrafted in the decree is not the same one imposed by the deed and I, therefore, believe the decree should be reversed.