Lillian Paschen, as Trustee Under the Last Will and Testament of Henry Pashen, Deceased, Plaintiff-Appellant, v. Aaron D. Pashkow and Rose L. Pashkow, His Wife, et al., Defendants-Appellees.

Gen. No. 49,979.

First District, Third Division.

September 16, 1965.

Francis J. McConnell and Francis J. Mahon, of Chicago (McConnell, Curtis & McConnell, of counsel), for appellant.

Arvey, Hodes & Mantynband, of Chicago (Louis M. Mantynband and Walter V. Lesak, of counsel), for Aaron D. Pashkow and Rose L. Pashkow, appellees; Gilbert Gordon, of Chicago, for Morris Braun and Rose Braun, appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal from a declaratory judgment in favor of the defendants entered at the close of plaintiff's case declaring that a covenant entered into in 1896 restricting Castlewood Terrace in the city of Chicago to single family residences was binding and enforceable. Plaintiff had sought the removal of the restriction in order to construct high-rise apartments.

Castlewood subdivision was subdivided and platted in 1896. The boundaries were, at the time of the platting of the subdivision, Ainslie on the north, Lake Michigan on the east (now Marine Drive), LaFayette on the south (now Gunnison) and Sheridan road on the west. Castlewood Terrace bisected the Castlewood subdivision and ran east from Sheridan road to Lake Michigan. The subdivision plat shows 21 lots on the north side of Castlewood Terrace and 22 lots on the south side. The rear of the lots on the south side of Ainslie and the north side of LaFayette abutted the rear of the Castlewood Terrace lots.

Plaintiff's lot 22 was on the north side of Castlewood Terrace and the east side adjoined Lake Michigan. Plaintiff's lot 64 was on the south side of Castlewood

58

Terrace and the east side of said lot was Lake Michigan. Immediately to the west of plaintiff's lot 64 was plaintiff's lot 63. All of the deeds to the Castlewood Terrace lots contained the following pertinent restrictions:

"(1) That no building, except bay windows, porches porticos and front door steps shall be built or maintained upon said lots between the building line laid down and designated on the recorded plat of said subdivision and any part of the street designated on said plat as Castlewood Terrace or said Castlewood Terrace as extended.

. . . . . .

"(4) That no apartment or flat building or structure built, used or adapted for the separate housekeeping of more than one family shall at any time be built or maintained upon said premises."

The lots facing Ainslie and LaFayette (now Gunnison) only had a ten foot building line restriction which expired in 1931. These lots have been improved with three and six flat apartments, and back up to the Castlewood Terrace lots. The lots on either side of Castlewood Terrace, except for plaintiff's lots and the lots abutting Sheridan road, were improved with single family residences. Many of these residences were constructed prior to 1920; however, they are well maintained. Since the platting of the subdivision, Marine Drive has been built and is presently the east boundary of the subdivision. The east terminus of Castlewood Terrace is now Marine Drive and its west terminus is Sheridan road. Castlewood Terrace is 50 feet wide and its length is 1200 feet. No streets intersect it.

Since the construction of Marine Drive plaintiff's lot 22 has a frontage of 189′ 1¼″ on Castlewood Ter-

race, and its easterly boundary line is 117′ 2″ on Marine Drive. Plaintiff's lot 64 since the construction of Marine Drive has a frontage of 150′ 8¾″ on Castlewood Terrace, and its easterly boundary is 118.41′ on Marine Drive.

The building line restriction which provides for a setback of 25 feet from the street line of Castlewood Terrace includes plaintiff's three lots, as does the restriction to single family residences. Some of the homes are on single lots and some on two lots. Castlewood Terrace is substantially a homogeneous area, different in character from what was described by one of plaintiff's witnesses as "the blighted apartment district around it."

The number of vehicles travelling north and south at the intersection of Marine Drive and Lawrence avenue two blocks south of Castlewood Terrace on December 24, 1959, totalled 2467, and the total of vehicles travelling north and south at Marine Drive and Margate Terrace two blocks north of Castlewood Terrace on June 2, 1961 was 3202. The record does not disclose a traffic count of vehicles passing the intersection of Marine Drive and Castlewood Terrace.

Plaintiff acquired title to the lots in question in 1916. Between 1930 and 1935 Lincoln Park was extended from Montrose to Foster by reclaiming submerged land. Marine Drive was constructed along what was previously the water's edge. There have been 14 high-rise buildings erected on Marine Drive between Irving Park and Foster avenue, which streets are respectively 12 blocks to the south of and five blocks to the north of Castlewood Terrace. At the southwest corner of Ainslie and Marine Drive an 8-story high-rise apartment has been erected, and on the northwest corner of Gunnison and Marine Drive the Fairview Hospital has been constructed. At the northeast corner of Castlewood Terrace and Sheridan road an elementary

60

school has recently been erected. The three lots upon which the school is located were condemned by the city of Chicago in trust for use of schools.

One of plaintiff's witnesses testified that the erection of a school at the northeast corner of Castlewood Terrace and Sheridan road has reinforced the residential homogeneous character of Castlewood Terrace. The fact that it has been erected at the west edge of the single family home enclave tends to create a wall between it and the "blighting influences on the western side of Sheridan road." It does not destroy the residential character of Castlewood Terrace but actually reinforces it. At the southeast corner of Castlewood Terrace and Sheridan road there is presently located a recreational and parking area for the McCormick Boys' Club. The club building is located at the northeast corner of Gunnison and Sheridan road. The portion of the boys' club's land located at the southeast corner of Sheridan road and Castlewood Terrace and fronting on Castlewood is improved by a fence, some landscaping with benches and a paved parking area for about six or seven cars which is under the exclusive control of the people who operate the boys' club.

The use to which the land fronting on Castlewood Terrace is devoted is not prohibited by any restrictive covenant involved in this case.

The evidence shows that there was a marked difference between the level of maintenance of the single family residences and property on Castlewood Terrace and that of Gunnison street to the south and Ainslie street to the north, and that the level of maintenance on Castlewood Terrace is superior to that of the other two named streets.

One of plaintiff's witnesses, who is a planning and zoning consultant, testified that he wholeheartedly agreed with the following statement in the report

61

written by Jack Meltzer and Associates for the
Community Renewal Program:

> "Castlewood Terrace stands out as another single
> street of residences distinct from its surroundings.
> Again having a physical and visual terminus at
> both ends, it is unique by virtue of the housing
> types found here. Amidst an area which is solidly
> built up with apartment buildings and high-rise
> structures, this street exists as a segment of single-
> family dwellings.

> "The balance between open space and buildings
> creates a visual contrast to the dense surrounding
> blocks. The abundance and maturity of the land-
> scaping provides a sense of nature and freshness
> in juxtaposition to adjacent brick and asphalt
> environment, and a secluded atmosphere is thus
> achieved. Although abruptly defined by an in-
> stitutional use and high-rise buildings at its end,
> the homogeneous composition within the major
> portion of the block retains the clarity of this area
> as an environment. Thus a quality of identity as
> a spatial unit exists for the block which is more
> than the sum total of each building and lot. The
> observer is impressed with the image of a style
> of life carried on at a relaxed pace."

This same witness testified that he did not know
whether the covenant was essential to maintaining the
previous described condition. This witness also testi-
fied that some of the residences are on 100-foot wide
properties with gracious gardens, and that everything
Mr. Meltzer has stated is true from the point of view
of gracious living. However, he also testified that the
use of the subject property for high-rise residences
would in no way detract from the gracious living that
now exists there. He likewise testified that his testi-

mony had to do with the two corner properties, the subject properties, and their highest and best use, and nothing else. His opinion of the highest and best use for the subject properties would be high-rise multiple family residential use.

The unpaid general taxes and special assessments levied against the subject property through the year 1960, exclusive of interest, penalties and costs, amount to approximately $61,500. Interest and penalties on said taxes would amount to well over $100,000. The record indicates that no taxes or special assessments have been paid on the subject property since it was acquired by plaintiff's predecessors in 1916.

Another of plaintiff's witnesses testified that the construction of a high-rise apartment building on the subject property would have a substantial effect on the desirability of the fifty feet immediately adjacent to the vacant land in question and a slight effect on the next fifty feet west, and no effect further west. The effect on the first fifty feet would be adverse.

The present zoning prohibits high-rise buildings on Castlewood Terrace. There have been conveyances of single family units on Castlewood Terrace up until as recently as 1961, and one of plaintiff's witnesses testified that there was a "sold" sign in front of one of the houses at the time of the trial. There has consistently been a market for single family dwellings on Castlewood Terrace for the past twenty-five years.

The record also indicates that the defendants and the owners of other lots on Castlewood Terrace have been vigilant in maintaining and enforcing the restrictive covenants. The restrictions have been upheld in the following cases as valid and binding on all of the lots on Castlewood Terrace: Cuneo v. Chicago Title & Trust Co., 337 Ill 589, 169 NE 760 (1929); Kruetgen v. General Outdoor Advertising Co., 288 Ill App 619, 6 NE2d

63

469 (1937); Kruetgen v. Hyde, Circuit Court of Cook County, Illinois, Case No. 40 C 7967 (1940); Miles v. Northern Trust Co., Circuit Court of Cook County, Illinois, Case No. 49 C 8640 (1949); and Simons v. Work of God Corp., 36 Ill App2d 199, 183 NE2d 729 (1962).

The evidence further shows that in purchasing their properties on Castlewood Terrace the defendants were aware of the existence of the said restrictions and relied upon them, and that when the plaintiff's predecessors acquired the subject property in 1916 they had full knowledge of the restrictive covenants.

The evidence indicated that the lot to the west of the subject property on the south side of Castlewood Terrace would suffer a considerable loss; that on the north side of Castlewood Terrace the 100 feet to the west of plaintiff's lot would suffer a loss of from 10 to 15% of the current market value, and that further west the decline in value would be so small as to be incalculable.

There was testimony that the value of the plaintiff's property on the northwest corner of Marine Drive and Castlewood Terrace for high-rise apartments would be, in the opinion of one witness, $210,600, and that the plaintiff's property on the southwest corner of Castlewood Terrace and Marine Drive for high-rise apartments would be worth $258,800. The same witness expressed an opinion of value of the subject property for single family residences to be $110,000. He arrived at his valuation of the subject property for residential use by comparing it with values of first grade residential prices in the suburbs.

■ The plaintiff first contends that the trial court permitted error in its findings and in its reasons for entering the judgment below. The findings of the trial court, or the reasons assigned by the trial court for its judgment are not controlling. It is the judgment of the trial court which this court will review and not

64

the trial court's reasons for entering it. Haney v. Haney, 37 Ill App2d 216, 185 NE2d 409; Abrams v. Schlar, 27 Ill App2d 237, 169 NE2d 583; Murphy v. Lindahl, 24 Ill App2d 461, 165 NE2d 340.

■ The question squarely confronting the court is whether the evidence showed such a substantial change in the character of the surrounding neighborhood as to make it impossible any longer to secure in a substantial degree the benefits sought to be realized through the performance of the building restriction. American Law of Property, Vol 2, sec 9.39, p 445.

In Wallace v. Hoffman, 336 Ill App 545, 84 NE2d 654, the court said on page 554:

> "The law is well settled that even where a general plan is shown the restrictions under the plan will not be enforced where violations have been acquiesced in (McGovern v. Brown, 317 Ill 73; Curtis v. Rubin, 244 Ill 88; Restatement, Property, § 561) or where the character of the neighborhood has so changed since the restrictions were imposed as to defeat the original purpose of the plan (Ewertsen v. Gerstenberg, 186 Ill 344)."

We then come to the question as to whether the evidence showed such a substantial change in the neighborhood as to warrant the removal of the restrictive covenant limiting plaintiff's lots to single family dwellings. Plaintiff points out that Castlewood Terrace was subdivided and the deed restrictions in question were imposed in 1896. At that time the Uptown area which included the Castlewood subdivision was only sparsely developed. The automobile had not been invented and high-rise buildings were non-existent. The plaintiff acquired the subject lots in 1916 when they abutted the water's edge of Lake Michigan. This condition prevailed as late as 1929. The eastern terminus of Castlewood Terrace was then at the water's

edge. Marine Drive was constructed between the years 1930 and 1935. Many high-rise apartments have been erected on Marine Drive between Irving Park on the south and Foster avenue on the north, and at Lawrence avenue and Marine Drive there has been constructed a large motel. The three expert witnesses for the plaintiff testified that in their opinion the present highest and best use for the subject lots was for high-rise apartments. Two of them testified that the change and development along Marine Drive affected the character and use of plaintiff's lots. One witness testified that prior to the development of Marine Drive the present high-rise sites were not readily marketable for construction of high-rise apartments because access was difficult.

Plaintiff also points out that the testimony shows that a high-rise apartment would only have an adverse effect on the marketability of the lot immediately to the west of plaintiff's lots and that it would cause depreciation in varying degrees.

One of plaintiff's witnesses testified that to restrict plaintiff's lots to single family dwellings would be entirely out of keeping with the character of the lake front, and that the improvements immediately to the north and south of the subject property hem in the subject property so that the only logical and proper use is for high-rise residential purposes.

The plaintiff also points to the large differential in value of her lots if the building restrictions are not removed. In Hartman v. Wells, 257 Ill 167, 100 NE 500, the court, discussing the right to enforce a restrictive covenant relating to building lines, on page 172 said:

"The evidence as to whether appellant's property was damaged by the violation of the agreement was conflicting, but we do not think that was a

66

material question. In Consolidated Coal Co. v. Schmisseur, 135 Ill 371, the court, in discussing the enforcement of negative covenants in courts of equity, said it was well settled that equity would entertain bills for injunctions to prevent their breach although the breach would cause no substantial injury or although the damages might be recoverable in an action at law. 'This is upon the principle that the owner of land selling or leasing it may insert in his deed or contract just such conditions and covenants as he pleases touching the mode of enjoyment and use of the land. As said in Steward v. Winters, 4 Sandf Ch 587: "He is not to be defeated, when the covenant is broken, by the opinion of any number of persons that the breach occasions him no substantial injury. He has a right to define the injury for himself, and the party contracting with him must abide by the definition." (Hill v. Miller, 3 Paige, 254; Macher v. Foundling Hospital, 1 Ver & B 188; High on Injunctions, 1142.) In this latter class of cases the court proceeds upon the ground that the grantor or lessor having expressly stipulated that the grantee or lessee shall not do the particular thing complained of, the latter is bound to refrain, and the former is not required to submit to the opinions of others as to whether he will or will not suffer substantial injury.' That case was cited and quoted in substance in the opinion in Star Brewery Co. v. Primas, 163 Ill 652. In Steward v. Winters, supra, cited in both the last mentioned cases, Vice-chancellor Sandford, delivering the opinion of the court said: 'It is said that the remedy at law for damages is adequate, and that, so far from there being an irreparable injury by the continuance of the breach of this covenant, it is shown there can be no injury at all. I apprehend that we are not to

67

regard this subject in the manner indicated by the latter proposition. The owner of the land selling or leasing it may insist upon just such covenants as he pleases touching the use and mode of enjoyment of the land, and he is not to be defeated, when the covenant is broken, by the opinion of any number of persons that the breach occasions him no substantial injury. He has the right to define the injury for himself, and the party con-- tracting with him must abide by the definition.' "

■ We feel that the question of damage to the properties of the defendants herein, all of which properties are on Castlewood Terrace, is not to be determined by opinions of plaintiff's witnesses, but that the defendants have a right to define the injury for themselves and the party to the restrictive covenant must abide by the definition. Obviously, the defendants in this case would not have resisted this case, nor would the property owners on Castlewood Terrace have so diligently in the past fought any and all violations of the restrictive covenants in the deed if they in their own minds had not considered that a violation or removal of the restriction would constitute substantial injury.

We now come to the case of Cuneo v. Chicago Title & Trust Co., 337 Ill 589, 169 NE 760. The Cuneo case involved the same subdivision and the same street, Castlewood Terrace. The plaintiff, Cuneo, in that case owned three lots at the southeast corner of Sheridan road and Castlewood Terrace, which were improved by his residence and garage. Cuneo's house faced Sheridan road. There was one other plaintiff in the case who owned property fronting on Castlewood Terrace. A bill was filed in the circuit court seeking to remove the building restrictions from their property in what is known as Castlewood subdivision. The

68

building restrictions in that case are identical to the restrictions contained in plaintiff's deeds and the deeds of all parcels on Castlewood Terrace. There the questions decided by the court were: First, has the neighborhood surrounding Castlewood Terrace, since the making of the deeds containing the restrictions, so changed in character and environment that the object of the restrictions can no longer be accomplished by their enforcement so that it would be inequitable and oppressive to enforce them? And second, are appellees, because some of them built sun porches and other like structures extending beyond the building line, which were not objected to or were consented to by other owners, deemed to have waived or abandoned all restrictions affecting such property?

There was evidence in the instant case of violations of the building line restriction on Castlewood Terrace similar to evidence which was offered in the Cuneo case. The court on page 595 of the Cuneo case said the following:

"Restrictions upon the use of property such as were created by the deeds to this subdivision, and which are imposed as a part of a general plan for the benefit of all the lots affected, give to the purchasers of such lots a right in the nature of an easement, which will be enforced in equity, and, upon equitable principles, against owners of other lots so affected. (Curtis v. Rubin, 244 Ill 88; Hutchinson v. Ulrich, 145 id. 336; Frye v. Partridge, 82 id. 267; Evans v. Faust, 194 Mass 513.) Where the intention is clearly shown by the restrictions, and the enforcement of such restrictions is necessary for the protection of substantial rights, they will be enforced. The rule in this State likewise is, that equity will not enforce a restriction where, by the acts of the grantor who im-

69

posed it or of those who derived title under him, the property and that in the vicinity has so changed in its character and environment and in the uses to which it may be put as to make it unfit or unprofitable for use if the restriction be enforced, or where to grant an injunction against violation of such restriction would be a great hardship on the owner and of no benefit to the complainant, or where the complainant has waived or abandoned the restriction. Ewertsen v. Gerstenberg, 186 Ill 344; Star Brewery Co. v. Primas, 163 id. 652; Trustees of Columbia College v. Thatcher, 87 NY 311; McArthur v. Hood Rubber Co., 221 Mass 372, 109 NE 162; Page v. Murray, 46 NJ Eq 325."

The plaintiffs in the Cuneo case had proved that there had been a great increase in the number of business buildings in the neighborhood and that Sheridan road had become a heavily congested avenue of traffic, with its attendant unpleasant odor of burning gas, noises and vibrations. However, there was no evidence of any change in the character of the property on Castlewood Terrace where the defendants resided and owned their homes. It was pointed out in that case that at the time of the original platting of Castlewood subdivision there was no business in that vicinity and very few houses; that now large hotels and office buildings have been erected in the neighborhood but none on Castlewood Terrace and that Ainslie street between Sheridan road and the lake has been built up with apartment houses, as has been LaFayette parkway. The court there said that the development of Ainslie street and LaFayette parkway did not constitute a change from the original plan as to those streets; that that condition was contemplated at the time the restrictions were put on the property on

70

Castlewood Terrace; that the property in Castlewood subdivision abutting on Ainslie street and LaFayette parkway were under no restrictions against apartment buildings other than as to stairways above the second floor and a building line restriction which was to expire in 1931, accordingly, the apartment buildings did not constitute a change from what was contemplated at the time the subdivision was laid out. The court then pointed out that porticoes, porches and enclosed sun rooms had been built beyond the building line on Castlewood Terrace and on page 597 of the Cuneo case (337 Ill 589) the court said:

"Though it be conceded that the building line restriction has in this particular been violated by some of the lot owners on Castlewood Terrace, there is no evidence of the breach of any other of these several restrictions. Abandonment or acquiescence in the violation of one restriction does not amount to the abandonment of other separate and distinct restrictions material and beneficial to the owners of lots affected by them. Oliver v. Williams, 221 Mich 471, 191 NW 34; Ewertsen v. Gerstenberg, supra; Berry on Rest on Real Prop sec 375."

▉ The violation of some of the property owners on Castlewood Terrace as to the building line in the instant case did not constitute an abandonment of the restriction which limited the use of property to single family residences. Again, on page 598 of the Cuneo case the court said:

"The evident purpose of these restrictions on the property abutting on Castlewood Terrace, differing, as they do, from those on the property abutting on Ainslie Street and LaFayette parkway, was and is to preserve the lots facing on Castle-

71

wood Terrace as a residence district. The evidence does not show any changes in this character of these lots. While changes have taken place on Sheridan road, and appellants' property abutting on that street would doubtless be more valuable as commercial property than as residence property, yet equity cannot, on that ground alone, abrogate and set aside restrictions on the use of that property which have been made for the benefit of other property which has not been so changed. While it may be a financial hardship upon appellants to enforce the single-dwelling restrictions on their lots, yet it must be borne in mind that these restrictions were in the deeds which they took to the property and are made for the benefit of all of the lots on Castlewood Terrace. If the character of the property on Castlewood Terrace had by the acts of the owners thereof changed to the extent justifying a court of equity to remove restrictions that court should not hesitate so to do, but the fact of change in the neighborhood of the property on Castlewood Terrace does not, alone, warrant a court of equity in relieving the property of appellants here from the restrictions imposed. . . . Having purchased them subject to restrictions they are bound by them so long as the restrictions are reasonable and not contrary to some public policy or some positive rule of law. Frye v. Partridge, supra; Turney v. Shriver, 269 Ill 164; Van Sant v. Rose, 260 id. 401."

The Supreme Court in the Cuneo case, supra, refused to remove the building restrictions.

We have cited at length from the Cuneo case not only because it involves the same street and the same restrictions as are before us in this case, but also because we believe the change in character on Sheridan road at the west end of Castlewood Terrace and in the

surrounding neighborhood was no greater in that case than the change in character in the surrounding neighborhood at the east end of Castlewood Terrace and along Marine Drive. In the Cuneo case the plaintiffs contended that property conditions had changed about the subdivision and in the neighborhood, particularly on Sheridan road, since the purchase of the property. In the instant case plaintiff showed that since the purchase of the subject property Marine Drive had been constructed, and that constituted a change in the character of the neighborhood.

In the Cuneo case plaintiffs contended that the area surrounding Castlewood Terrace had become a business, hotel and apartment district. In the instant case plaintiff showed that the area surrounding Castlewood Terrace is an apartment district; that there are hospitals and a motel. In the Cuneo case the plaintiffs contended that Sheridan road had become a leading thoroughfare and one of the main business streets on the north side of Chicago, and that it was greatly congested with automobiles and heavy traffic. In the instant case plaintiff has offered testimony as to the volume of traffic on Marine Drive.

In the Cuneo case plaintiffs contended that on the west side of Sheridan road, opposite the property of Cuneo, the buildings had been extended to the sidewalk and were devoted almost entirely to stores, offices and other business enterprises, and that the plaintiffs' property by reason thereof had become and is best adapted for business purposes. Plaintiff in the instant case offered evidence to the effect that on the west side of Sheridan road opposite Castlewood Terrace the buildings are almost entirely devoted to stores, offices and other business enterprises, and that the plaintiff's property is best adapted for high-rise apartments and has ceased to be suitable or desirable for single family residence purposes. In the Cuneo case the plaintiffs

73

contended that they were prevented from using their property to its highest and best use, and that the restrictions contained in the deeds constituted and were a serious cloud upon title of the plaintiffs and therefore should be removed. Plaintiff in the instant case makes the same contentions.

Plaintiff in the instant case cites the case of Hirsch v. Hancock, 343 P2d 959, 173 Cal App2d 745, and contends it is remarkably similar on its facts to the instant case. We cannot agree that any similarity between the two cases exists. In the Hirsch case the property was located on the northeast corner of Wilshire Boulevard and Rossmore Avenue in Los Angeles, with a total frontage of 600 feet on Wilshire. By restrictions in the deeds the property could be used for only single family residences with setback lines. The restrictions also provided that no lot should be used for drilling for or producing therefrom oil, gas or other minerals. Wilshire, at the time of trial, was one of the principal east and west business and vehicular thoroughfares in metropolitan Los Angeles, extending about sixteen miles from downtown Los Angeles to the Pacific Ocean. It ran through the cities of Beverly Hills, Westwood and Santa Monica, and was intersected by over 200 north-south streets, including all major north-south thoroughfares west of Grant Avenue. Rossmore then constituted a heavily travelled north and south principal traffic thoroughfare from Wilshire to Hollywood. There was a continuous stream of motor vehicles on Wilshire, including light commercial vehicles and public conveyances, from early morning until late at night. 32,000 to 39,000 motor vehicles passed the intersection of Wilshire and Rossmore daily. Two bus companies operated bus lines on Wilshire and one was operated on Rossmore. About 70 diesel-powered buses passed or stopped at the intersection of the two streets every hour during the peak

74

hours of the morning and afternoon. There were four bus stops at the intersection. There was a taxi stand on the northwest corner of the intersection. Traffic lights were installed on the northwest and northeast corners of the intersection and on the south side of Wilshire. An ornamental lighting system was installed on Wilshire having light standards 25 feet high on each side of the street at intervals of about 150 feet. They were lighted at all hours of the night. New lights were installed in 1957 consisting of 404 twin-light fixtures giving at least six times the former illumination, and were affixed to metal standards about 32 feet above curb grade. They lighted the area at night as "bright as day" and made that portion of Wilshire the "best lighted street in the nation." Noise, dust, fumes, rubbish and confusion resulted from the heavy traffic and it jeopardized the safety of children. Practically all of the lots on the south side of Wilshire, except an 1,100-foot strip, were being used for various business or commercial purposes. Immediately adjoining the property of one of the plaintiffs was a three-story office building with 80-foot Wilshire frontage and 100 feet in depth. Along Wilshire there was continuous and virtually uninterrupted commercial development, including height-limit office buildings, banks, theaters, hotels, restaurants, drive-ins, gasoline service stations, retail establishments, cocktail bars, automobile dealers, billboards, and virtually every other type of development.

To say that the facts in the Hirsch case bear a marked similarity to those in the instant case is, to say the least, being unrealistic.

■ ■ Plaintiff properly states the law that the court will not uphold a restrictive covenant where the property and the neighborhood have, since the inception of the covenants, so changed in character or environment that the objects of the covenants are

75

defeated or cannot be accomplished, and their enforcement would be harsh, inequitable or oppressive. (Mangini v. Oak Park Trust & Sav. Bank, 43 Ill App2d 318, 193 NE2d 479). But each case involving restrictive covenants must be decided on its own facts. Kruetgen v. General Outdoor Advertising Co., 288 Ill App 619, 6 NE2d 469.

In the instant case the residential character of Castlewood Terrace has never been violated. The street is only 1,200 feet long without intersections. The changes around this block caused by the construction of high-rise apartments, a motel and hospitals along Marine Drive have not affected Castlewood Terrace.

Plaintiff also cited the following cases: Piper v. Reder, 44 Ill App2d 431, 195 NE2d 224; Wallace v. Hoffman, 336 Ill App 545, 84 NE2d 654, and other cases, all of which, we feel, are clearly distinguishable from the instant case on their facts.

In the case of Drexel State Bank of Chicago v. O'Donnell, 344 Ill 173, 176 NE 348, the court commented on the fact that the chancellor did not find either that the restriction which was sought to be destroyed was no longer a benefit to the properties of the appellant, or that the erection of apartments upon the 40½ feet at issue would not have appreciably injured or damaged their property for residence purposes. The court ruled in that case that where the restriction involved still remains of substantial advantage to the property which it was created to protect, and where the changes invoked are not shown to have affected said property more vitally than they apparently had in that case, a court of chancery could not undertake to wipe out duly recorded covenants solemnly entered into for the protection of property rights and in reliance upon which such rights had been acquired.

76

In Turney v. Shriver, 269 Ill 164, 109 NE 708, the court held that while it may be a hardship on appellants to enforce strict compliance with the restrictions in their deed and thereby prevent them from devoting their property to a use which, by reason of the subsequent development of the subdivision and change in conditions and travel, is apparently advantageous to them, yet that fact alone would not warrant the court in relieving them from the obligations of the bargain which they voluntarily made.

The plaintiff has seriously contended that the construction of the school at the west end of Castlewood Terrace at Sheridan road constituted a change of conditions in the neighborhood, however, in the case of Bolger v. Village of Mt. Prospect, 10 Ill2d 596, 141 NE2d 22, on page 603 the court said:

> "The nursery is a nonconforming use and the school is a permitted use in all R–1 single-family residence districts. Ideally, perhaps, the school should be located in the center of a residential district. But located as it is, it can properly be regarded as a buffer between the central business district and the residential area to the north."

That language is in part applicable to the case before us. The school did not constitute a change in the character of the neighborhood which would justify or warrant the removal of the single-family restrictive covenant, since the school, while ideally located in the center of a residential district, can be regarded as a buffer between Sheridan road and the single-family residences on Castlewood Terrace.

Plaintiff in this case acquired the property well knowing of the restrictions contained in the deed. It is true the subject property has not been improved, but the record is silent as to whether any effort has been made to dispose of the property, and there was

evidence to the effect that residences on Castlewood Terrace are desireable and have been purchased during the past twenty-five years. While it is true that plaintiff's evidence indicated that the subject property acquired its character from the buildings along Marine Drive, that was based upon the assumption that plaintiff's property faced Marine Drive. The plat of subdivision shows that plaintiff's properties face Castlewood Terrace, and the first restriction would seem to strengthen that conclusion wherein it forbids the building or maintaining of "porticoes" and "front door steps" between the building line on the plat and any part of the street, designated on the plat as Castlewood Terrace. Castlewood Terrace is and has been from its inception a residential street.

The plaintiff and her predecessors have failed to pay taxes on said lots since they were first acquired in 1916, and, as the trial judge noted in making his decision, ". . . if they had kept their taxes paid up I think this would be very desirable for a single family residence, as we have heard from one of the witnesses that this property is considered as well as the choice property in Wilmette or Winnetka for single-family residences."

We conclude that Castlewood Terrace and the neighborhood have not so changed in character and environment that the object of the covenants are defeated or cannot be accomplished, and the restrictions are reasonable and not contrary to public policy or any positive rule of law.

Judgment affirmed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.