[Civ. No. 23546.    Second Dist., Div. Three.    Sept. 21, 1959.]

JOSEPH A. HIRSCH et al., Respondents, v. G. ALLAN HANCOCK et al., Defendants; MAURICE W. NUGENT et al., Appellants.

Augustus F. Mack, Jr., Nicholas & Mack, John H. Rice and Wright, Wright, Goldwater and Wright for Appellants.

Zagon, Sandler, Aaron & Rosen, S. S. Zagon and Marvin Manuel for Respondents.

VALLÉE, J.—Appeal from a judgment granting plaintiffs relief from restrictions limiting the use of their respective real properties.

Plaintiff Joseph A. Hirsch has been since September 4, 1945, the owner of parts of Lots 21 and 20 in Tract 3446 on the northeast corner of Wilshire Boulevard and Rossmore Avenue in Los Angeles. The property has a footage of 250 feet on Wilshire and about 147 feet on Rossmore. A single-family residence, erected more than 30 years ago, is situated on the property.

Plaintiff Madeleine E. Hirsch has been since October 9, 1946, the owner of parts of the same lots in the same tract. Her property is located on the northerly side of Wilshire, 250 feet easterly from the northeast corner of Wilshire and Rossmore. It has a footage of 50 feet on Wilshire, is about 147 feet in depth, and is contiguous to the property of plaintiff Joseph A. Hirsch. It is, and always has been, vacant and unimproved.

Plaintiffs Duntley are trustees of a testamentary trust created by the will of George Marshall Duntley who died in 1956. From July 23, 1925, to his death, the deceased was the owner of Lot 22 on the northwest corner of Wilshire and Rossmore in the same tract. Lot 22 has a footage of about 300 feet on Wilshire and about 142 feet on Rossmore. It is, and always has been, vacant and unimproved.

Wilshire Boulevard is a public highway running generally east and west, commencing at Grand Avenue in downtown Los Angeles and continuing westerly to the Pacific Ocean. Rossmore Avenue is a public highway running generally north and south from Wilshire to Melrose Avenue where it joins Vine Street. Vine Street continues north to that area of Los Angeles known as Hollywood.

Tract 3446 is a part of and constitutes the easterly boundary of an area generally referred to as Hancock Park. The tract is divided into 42 lots, each of which abuts upon the east or west side of Rossmore, and constitutes all the property on both sides of Rossmore from Wilshire north to Third Street, a distance of four blocks. Plaintiffs' lots are the only ones in the tract which are contiguous to Wilshire. They have a total frontage of 600 feet on Wilshire.

Prior to December, 1919, the land embraced in the tract consisted of one parcel. In 1919 the owner subdivided the land into lots and from time to time thereafter sold and conveyed all the lots to various persons. Each of the deeds conveying the lots provided that each lot shall be used solely for single-family residence with setback lines; that no lot shall be used for the purpose of drilling for or producing therefrom oil, gas or other minerals; that the conditions and obligations so

imposed shall be covenants running with the land for the benefit of each and all of the owners in the tract and their respective successors in interest; and that the restrictions, conditions and covenants shall be effective until January 1, 1970.

There are six parcels in the tract which are wholly un-improved. All the other lots have been improved with single-family residences erected about 30 years ago except one in each of the following years: 1928, 1930, 1939, and 1949.

In 1919, when tract 3446 was subdivided, and at the time of the first sale of Lots 20 and 21 in 1923 and of Lot 22 in 1925, the tract was situated on the outskirts of Los Angeles and was vacant and unimproved. The property within a radius of several miles was then devoted exclusively to resi-dential or agricultural purposes, or for oil wells. There was no commercial or business development of any kind in the vicinity of the tract nor within a radius of at least one mile of plaintiffs' properties. At that time Wilshire ex-tended about five miles from its eastern extremity (MacArthur Park) to its westerly terminus at the La Brea Tar Pits. Westerly from Bronson Avenue, which is about a half mile east of plaintiffs' properties, it was a 16-foot road.

At the time Tract 3446 was subdivided the population of Los Angeles was about a fifth of what it is today. There was very limited traffic on Wilshire, and no public means of conveyance on it west of Western Avenue, about a mile east of the tract. The nearest public conveyance was a street car line on West Third Street at Larchmont Avenue, between a half mile and a mile northeasterly from plaintiffs' prop-erties. The only business structures on Wilshire were several stores at its intersection with Vermont Avenue, several small structures at its intersection with Western Avenue, and a minor structure containing two small storerooms at La Brea Avenue.

The following changes have occurred on Wilshire since the restrictions were imposed:

1. Wilshire is now one of the principal east-west business and vehicular thoroughfares in metropolitan Los Angeles, extending about 16 miles from downtown Los Angeles to the Pacific Ocean. In 1927 it was paved to a width of 70 feet, with a dedicated width of 100 feet, from Park View to Fair-fax Avenue about 2 miles west of plaintiffs' properties. It was extended to its present easterly terminus at Grand Avenue in 1935. Prior to that time it had been extended

westerly to the city limits and through the cities of Beverly Hills, Westwood, and Santa Monica to the ocean. It is intersected by over 200 north-south streets, including all major north-south thoroughfares west of Grand Avenue.

Rossmore and Highland Avenue are the only through north-south streets in Hancock Park. Rossmore and Vine Street, to which Rossmore connects at Melrose Avenue northward, now constitute a heavily traveled north and south principal traffic thoroughfare from Wilshire to Hollywood.

2. Wilshire has become one of the most heavily traveled thoroughfares in Los Angeles, other than vehicular freeways. There is a continuous stream of motor vehicles on it, including light commercial vehicles and public conveyances, from early morning until late at night. Thirty-two thousand to 39,000 motor vehicles pass the intersection of Wilshire and Rossmore daily. Two bus companies operate bus lines on Wilshire and one is operated on Rossmore. The bus lines are in operation from 5 a. m. each day until at least 3 a. m. the following day.˙ About 70 diesel-powered buses pass or stop at the intersection of the two streets every hour during the peak hours of the morning and afternoon, or more than one bus a minute. There are four bus stops at the intersection, one on the northeast corner adjoining the property of plaintiff Joseph Hirsch, another on the northwest corner adjoining the property of plaintiffs Duntley on Wilshire, another on the same corner on Rossmore, and the fourth on the south side of Wilshire at the intersection. There is a taxi stand on the northwest corner of the intersection adjacent to the Duntley property.

3. Traffic lights are installed on the northwest and northeast corners of the intersection and on the south side of Wilshire. The signals create a situation where automobile and bus traffic headed south on Rossmore is often stopped and backed up for about a half block on Rossmore.

4. About 1928 an ornamental lighting system was installed on Wilshire. It consisted of 25-foot light standards placed on each side of the street at intervals of about 150 feet. Two of these standards were adjacent to the property of plaintiffs Hirsch and two were adjacent to the property of plaintiffs Duntley. They were lighted at all hours of the night. In 1957 new street lights were installed, replacing the single-lamp lights. The new lights consist of 404 twin-light fixtures giving at least six times the former illumination, and are affixed to metal standards about 32 feet above curb grade.

They light the area and the house on the northwest corner of Wilshire and Rossmore at night as "bright as day." They make that portion of Wilshire the best lighted street in the nation.

5. Plaintiffs' properties are annually assessed for street lighting maintenance on Wilshire based on the boulevard frontage at the current annual rate of 80 cents a front foot. The annual rate in residential districts of Los Angeles is from 10 to 14 cents a front foot.

6. There was evidence that a newsboy hawks papers at night at the intersection of Wilshire and Rossmore and that he "makes a great deal of racket"; that noise, dust, fumes, rubbish, and confusion result from the heavy traffic, and that it jeopardizes the safety of children.

7. About 1924 the zoning of all lots abutting on both sides of Wilshire from its then eastern terminus at Park View Street to Western Avenue was changed to permit business or commercial uses. At that time, substantially all lots abutting on both sides of Wilshire between Western Avenue, about one mile east of plaintiffs' properties, and La Brea Avenue, one mile west of plaintiffs' properties, were restricted either by deed or zoning ordinance, or both, to single-family residence use. By 1951, due to numerous changes in zoning, all the property on both sides of Wilshire from its downtown terminus at Grand Avenue westerly to and through Beverly Hills to its intersection with Santa Monica Boulevard, was zoned for business or commercial uses, except a strip, zoned R1, in which plaintiffs' properties are situated, commencing on the north side of Wilshire at Bronson Avenue seven blocks east of plaintiffs' properties and on the south side commencing at Crenshaw Boulevard six blocks east of plaintiffs' properties and extending on both sides westerly about one mile to Highland six blocks west of plaintiffs' properties.

8. In 1951 all property abutting on Wilshire within the mile strip was zoned CR, a limited commercial use, except the following: on the north side of Wilshire, about 1,450 feet between Bronson Avenue and Lucerne Boulevard (about five blocks), and about 2,800 feet between Arden Boulevard and McCadden Place (about six blocks), of which about 500 feet is occupied by a public school; on the south side of Wilshire, about 1,100 feet between Lucerne and Muirfield Road (about three blocks). In April, 1954, by judicial decree the single-family residence restrictions were removed from about 900 feet of Wilshire frontage on the north side from Bronson

Avenue westerly three blocks to Windsor Boulevard. In December, 1954, the zoning of that property was changed from R1 to CR. This rezoned property is about four blocks east of plaintiffs' properties. Tidewater Oil Company has constructed a $10,000,000 six-story office building upon this Wilshire frontage between Irving and Lorraine Boulevard.

9. On the south side of Wilshire westward from Lucerne Avenue (two blocks east of plaintiffs' properties) to the city limits of Los Angeles and beyond to the intersection of Wilshire and Santa Monica Boulevards in Beverly Hills, the lots are not now restricted to residential uses except a strip of about 1,100 feet which forms the northerly boundary of a restricted residential development known as Fremont Place on which the deed restrictions expire January 1, 1960. At least as far west as Highland Avenue, all of the lots were formerly restricted to residential uses only, but the restrictions have expired or in some cases been nullified by court decisions. All or substantially all of the lots on the south side of Wilshire, except the 1,100-foot strip, are now being used for various business or commercial purposes.

10. On the north side of Wilshire westward from Lorraine Boulevard (five blocks east of plaintiffs' properties) to Highland Avenue, the lots are and always have been vacant and unimproved except for a large public Junior High School, two gasoline service stations, a large parking lot, a three-story office building, and three structures originally erected as residences, two of which have been removed and the third being the residence on the property of plaintiff Joseph Hirsch. Most of these vacant lots are under deed restrictions similar to those affecting plaintiffs' properties. They are restricted to single-family residence use for about one and a half blocks between Plymouth and Lucerne Boulevards until September, 1961, and commencing with plaintiffs' properties at Rossmore and extending west to McCadden Place until 1970.

11. On the north side of Wilshire westward from Highland Avenue to the city limits of Los Angeles and beyond to the intersection of Wilshire and Santa Monica Boulevards in Beverly Hills, substantially all lots are improved with commercial structures except for a public park known as Hancock Park (La Brea Tar Pits) extending from Curson Avenue to Ogden Drive within the area. "Miracle Mile," one of the most thoroughly and elaborately developed commercial districts in Los Angeles, is located within this area and includes development on both sides of Wilshire.

12. For more than 30 years no single-family residence has been constructed on any lot contiguous to Wilshire from downtown Los Angeles to the city limits and westerly therefrom to Santa Monica Boulevard in Beverly Hills.

13. From downtown Los Angeles through Beverly Hills there are only four homes occupied as such on Wilshire Boulevard: one is on plaintiff Joseph A. Hirsch's property; the other three are across Wilshire from plaintiffs' properties. The restrictions on these three expire in 1960. It was stipulated that the owners of these properties intend to convert or sell them for commercial use at that time.

14. Since the zone change from R1 to CR in 1951, commercial buildings have been constructed, are now planned or under construction, and residences have been converted to business uses within a half-mile of plaintiffs' properties.

15. Immediately adjoining the property of plaintiff Madeleine Hirsch on the east is a three-story office building erected in 1955, with 80-foot Wilshire frontage and 100 feet in depth. It is occupied by Zurich Insurance Company, with over 100 employees working therein. It has a parking lot in the rear and on the east side of the building with a capacity for over 60 automobiles.

16. A two-story office building was completed in 1955 on the southeast corner of Windsor and Wilshire, four blocks from plaintiffs' properties, and is now occupied by an insurance company and an investment company. Adjoining it on the east is another two-story office building completed in 1954 and occupied by two insurance companies. Just east of that building is a three-story office building recently completed and occupied. A three-story motel is under construction on the southwest corner of Windsor and Wilshire. A two-and-a-half-story building is located on the southwest corner of Lorraine and Wilshire about five blocks from plaintiffs' properties.

17. A residence on the southeast corner of Mullen Avenue and Wilshire, within two blocks of plaintiffs' properties, has been converted to and is being used as business offices for KPOL radio station. Another residence immediately adjoining it on the east has been converted to business office use. A residence on the southwest corner of Tremaine Avenue and Wilshire, five blocks west of plaintiffs' properties, constructed about 1927, and the last residence erected on Wilshire from downtown Los Angeles to Beverly Hills, has likewise been converted to business use. Single-family residence restrictions were removed by judicial decree. (*Alexander* v.

*Title Ins. & Trust Co.,* 48 Cal.App.2d 488 [119 P.2d 992].)[1]

18. During the past 25 years and within a half-mile of plaintiffs' properties, the following business uses have been established by zone change, zone variance, or judicial decree: a large office building on the southeast corner of Plymouth and Wilshire two and a half blocks from plaintiffs' properties occupied by a real estate office, a property management office, and an insurance company; a large automobile parking lot on the northwest corner of Lucerne and Wilshire, two blocks from plaintiffs' properties, used in connection with Wilshire Ebell Theatre and Club, a two-story building on the southwest corner of Lucerne and Wilshire extending south to Eighth Street used for public entertainment of various types; a seven-story office building and parking areas covering the entire block on Wilshire between Mullen Avenue and Rimpau Boulevard within two blocks of plaintiffs' properties and extending south to Eighth Street, occupied by Farmers Insurance Company with over 800 employees; a large automobile parking lot occupying the entire block between Rimpau Boulevard and Hudson Avenue, extending south to Eighth Street, also used by Farmers Insurance Company; a gasoline service station located on the northwest corner of McCadden Place and Wilshire; a gasoline service station located on the northeast corner of Highland Avenue and Wilshire; and several structures used for outdoor commercial advertising on various vacant lots on Wilshire.

19. Wilshire has become one of the most thoroughly developed and highly publicized commercial streets in Los Angeles. On both sides of Wilshire from downtown Los Angeles to Bronson Avenue on the north side and to Lucerne Boulevard on the south side, there is continuous and virtually uninterrupted commercial development, including height-limit office buildings, banks, theaters, hotels, restaurants, drive-ins, gasoline service stations, retail establishments, cocktail bars, automobile dealers, billboards, and virtually every other type of development.

20. Plaintiffs' properties are assessed for tax purposes by Los Angeles in amounts about four to five times greater than similar sized lots in Tract 3446 in the vicinity of plaintiffs' properties but not contiguous to Wilshire Boulevard.

Pursuant to stipulation of the parties, the trial judge inspected the entire Tract 3446, the general neighborhood sur-

---

[1]Within a half-mile to the east and west of plaintiffs' properties residential deed restrictions on at least six properties have been released by judicial decree.

rounding the tract, and Wilshire in front of and to the east and west of the tract.

The court found the detailed facts as we have stated them, and that since the subdivision of Tract 3446 and the imposition of the restrictions there has been a change in the uses of the property in the neighborhood and vicinity of plaintiffs' properties and a change in the character of Wilshire so that plaintiffs' properties are entirely unsuitable and undesirable for residential use; plaintiffs' properties are now essentially business or commercial properties and have no economical use whatsoever, except for business or commercial purposes; plaintiffs' properties are suitable for certain uses which are enumerated and such other uses as may be permitted or prescribed by the zone use classification into which the respective properties of plaintiffs may hereafter be placed by the city of Los Angeles; the changed conditions have not resulted from any breach of the conditions by plaintiffs or any of their predecessors in interest; the maintenance and enforcement of the restrictions so as to prevent the use thereof for business, commercial and other purposes enumerated, would be burdensome, oppressive and inequitable to plaintiffs and of no substantial benefit to the owners of any of the other lots in Tract 3446.

The court further found: the restriction against the use of plaintiffs' properties for the purpose of drilling for or producing oil, gas or other mineral substance, is valid only so far as it prohibits the operation of any drilling equipment upon the properties for the production of oil, gas or other mineral substance, or the erection or placing upon any of their properties of any derrick or machinery for the drilling or operation of oil or gas wells or for any other mineral substance; it would be inequitable, unreasonable, and unjust to plaintiffs to enforce the restriction so as to prevent the removal of subsurface oil, gas or other mineral substances underlying plaintiffs' properties by means of slant drilling from surface locations (where legally permitted) other than plaintiffs' properties.

The judgment decrees that plaintiffs' properties are not suitable for single-private residence use but are suitable for enumerated commercial uses and such other uses as may be permitted by the zone use classification into which the properties may hereafter be placed by the city of Los Angeles; the restriction with respect to drilling upon the properties for or producing therefrom oil, gas or any other mineral substance is valid as to surface operations but invalid as to subsurface

operation as stated in the findings; it would be inequitable, unjust, and oppressive to permit enforcement of the restrictions insofar as they prevent the use of the properties for the uses enumerated in the judgment. Defendants are enjoined from enforcing the restrictions for the uses enumerated therein.

Defendant G. Allan Hancock, who imposed the restrictions on the tract and who holds the reversionary interest for a violation thereof by any of the lot owners, entered his appearance and stipulated that his default be entered. The holders of interests in 21 of the lots in the tract and of any rights under the deeds to all of the lots either disclaimed or defaulted. Defendants-appellants, referred to as defendants, are the holders of interests in the remaining 19 lots.

Defendants first contend the findings that the restrictions are oppressive and inequitable to plaintiffs and will, unless removed, cause plaintiffs to continue to suffer irreparable injury are not supported by the evidence. It is asserted that even if the restrictions are removed, plaintiffs are still legally bound to use their properties for single-family residential use by reason of the existing R1 zone classification. The argument is beside the point. The question at bar is whether the restrictions are now binding. A valid restriction on the use of realty is neither nullified nor superseded by the adoption of a zoning ordinance, nor is the validity of the restrictions thereby affected. (26 C.J.S. 1181, § 171.) And, of course, the enforceability of restrictions is not necessarily affected by a zoning ordinance. Furthermore, there is evidence in the record which tends to indicate the probability that lots contiguous to Wilshire may be rezoned to the limited commercial CR classification after the release of the restrictions. By 1951 all of Wilshire from downtown Los Angeles through Beverly Hills was rezoned for commercial use except the mile strip in which plaintiffs' properties are located, and in October of that year, all of the mile strip was rezoned to CR except those lots under single-family restrictions. Expert testimony indicated that the previous zone changes on Wilshire had always been favorable to making abutting properties available for commercial use; that in the past the zoning authorities had paid no attention to restrictions but that they had made an exception to this rule in respect to the mile strip on Wilshire. In 1954, shortly after single-family residence restrictions were removed by court decree from three blocks of frontage within the mile

strip, the city changed the zoning classification of that three-block frontage from R1 to CR.

The record is replete with evidence of changes in the area since the original subdivision of the tract including the erection of a commercial structure immediately adjacent to plaintiffs' properties on the east, height-limit buildings on Wilshire within two blocks, greatly increased taxes and lighting assessments on plaintiffs' properties disproportionate to other properties in the tract. No single-family residence has been erected on Wilshire for over 30 years and restricted lots abutting on Wilshire have lain idle and undeveloped through the years. Throughout the entire length of the boulevard only four houses continue to serve as homes and the owners of three of them intend to convert or sell them for commercial use after January 1, 1960, when restrictions on them expire. Wilshire is now without doubt one of the principal commercial thoroughfares in Los Angeles carrying thousands of vehicles daily. The present R1 zoning limits any present use of plaintiffs' properties to single-family residence use. Whether this zoning classification is unsuitable for their properties and thus no longer in the public interest in view of the changed conditions is not at issue in this action. As between the parties, the court weighed the equities and found the restrictions on the properties in question oppressive to plaintiffs and of no benefit to defendants. The fact that the zoning classification may also be oppressive to plaintiffs and a contributing cause of injury to them is not determinative of the present validity of the restrictions.

Defendants complain of the fact the court found plaintiffs' properties, as restricted, have a sales value of from $250 to $400 a front foot on Wilshire for prospective business use as compared to a sales value of from $1,000 to $1,200 a front foot if the properties were relieved of the restrictions. They say ''loss of money profit is not sufficient to cause a court of equity to set aside deed restrictions.'' This was only one of many factors on which the court based its judgment. The court properly took this factor into consideration. (*Wolff* v. *Fallon*, 44 Cal.2d 695, 697-698 [283 P.2d 802]; *Hess* v. *Country Club Park*, 213 Cal. 613, 618 [2 P.2d 782]; *Alexander* v. *Title Ins. & Trust Co.*, 48 Cal.App.2d 488, 491 [119 P.2d 992].)

Defendants contend the finding that release of plaintiffs' properties would not constitute an ''entering wedge'' or an initial or any step toward deterioration of Tract 3446 as

a single-family residence district, or result in irreparable or any injury to any of the defendants, is unsupported by the evidence. There was ample evidence to support the finding. There was testimony that commercial use of plaintiffs' properties would not affect the properties adjoining them on the north, that whatever "effect it would have has already occurred years ago" by reason of the developments on Wilshire, and that as to the remainder of the lots in the tract such use "would have no effect upon them whatsoever"; that the two lots adjacent to plaintiffs' properties are already adversely affected for residential use by existing physical conditions such as traffic, fumes from buses and automobiles, traffic light signals, bus stops, street lights, and the building and parking lot adjacent to the Hirsch property. There was testimony that all the houses in the neighborhood are "outmoded" and that the area north of plaintiffs' properties "suffers from both economic and functional obsolescence." There was testimony that commercial use of plaintiffs' properties would not lessen the economic value of other lots in the tract; that the erection of commercial buildings upon their properties would not affect the suitability of the rest of the lots in the block for residential use, and would actually enhance the value of the remaining lots. On this and other evidence the court made the finding set out in the margin.[2] It is significant that all the owners of lots in the block in which plaintiffs' properties are situated defaulted or disclaimed with the exception of the owners of the two lots immediately north of plaintiffs' properties.

Defendants contend the termination of restrictions by

[2]"The aforesaid change in the character of Wilshire Boulevard from a residential to a commercial boulevard, coupled with the growth and development of business upon said Boulevard to the east and west of said Tract 3446, and the heavy bus and vehicular traffic upon Wilshire and Rossmore Boulevards, all as aforesaid, have already had a substantial detrimental, depressing and adverse effect upon the lots in said Tract for single family residence use, particularly upon the lots and residences in said Tract between Wilshire Boulevard and Sixth Street, which said residences because of their age of at least thirty years, outmoded design and the aforesaid conditions are suffering from functional obsolescence. The release of plaintiffs' properties from said deed restrictions to the extent hereinabove specified in Paragraphs VII and VIII would not have any further detrimental, adverse or depressing effect upon the remaining lots in said Tract than the effect already caused by the aforesaid changed conditions. To permit plaintiffs to use their respective said properties for lawful business, commercial and other purposes to the extent hereinabove specified in Paragraphs VII and VIII would not depreciate the value of the other lots in said Tract nor lower the existing general class and character of the other property in said Tract, and would tend to increase the market value of the property on Rossmore

judicial decree is justified only when their original purpose has become obsolete, and that the court made no such finding. A reading of the prevailing opinion and the dissent in *Wolff* v. *Fallon*, 44 Cal.2d 695 [283 P.2d 802], shows the point is groundless. In *Wolff*, which appears to be the latest case on the point, the court stated (p. 696) :

"The trial court, after making detailed findings as to changes which had occurred in the neighborhood since 1913, found and concluded that plaintiff's lot was not now suitable or desirable for residential use but was essentially business property, that its use for the commercial purposes would not detrimentally affect the adjoining property or neighborhood and might be beneficial, and that, by reason of the changed conditions in the neighborhood and present character of the block, enforcement of the restrictions would be inequitable and oppressive and would harass plaintiff without benefiting the adjoining owners. The findings, if supported by the evidence, warrant granting relief from the restrictions."

Defendants assert the finding that it would be unreasonable, inequitable, and unjust to plaintiffs to enforce the restriction on plaintiffs' rights to produce oil, gas or other mineral substances from under their properties by slant drilling from legally permitted locations other than upon their properties is unsupported by the evidence. They argue that should there be an oil pool under the tract it would be unfair and inequitable to permit plaintiffs to tap such a pool by directional drilling while defendants are restrained by their deed restrictions from drilling offset wells to protect their interests.

It was stipulated that at the time the restrictions were imposed in 1919 there were oil wells within a radius of several miles of Tract 3446. Judicial notice may be taken of the condition and development of the petroleum industry and of the physical and economic law governing oil production. (36

---

Avenue between Sixth Street and Wilshire Boulevard, particularly the Rossmore Avenue lots immediately adjacent to plaintiffs' properties."

(Paragraph VII finds that plaintiffs' properties are not suitable for single-private residence use but are suitable for enumerated commercial, business, and social uses and such other uses as may be permitted by zoning classification. It also finds that the restriction with respect to setback lines would be unduly burdensome, unreasonable, and inequitable to plaintiffs and of no substantial benefit to the owners of the other lots in the tract, and that setback lines should be in accordance with zoning laws. Paragraph VIII finds that the restriction with respect to drilling on plaintiffs' properties for, or producing therefrom oil, gas, or any other mineral substance is valid as to surface operations but invalid as to slant drilling.)

Cal.Jur.2d 621, § 10.) Slant drilling was unknown in 1919 when the restrictions were imposed. (Brantly, Rotary Drilling Handbook, 364.) █ It is a matter of common knowledge that such method of drilling for oil is now prevalent in the Los Angeles metropolitan area. There are now oil producing districts in the Los Angeles metropolitan area involving entire neighborhoods of residential properties with slant drilling from legally permitted locations. █ As stated earlier, the trial judge inspected the entire tract, the general neighborhood surrounding the tract, and Wilshire in front of and to the east and west of the tract. █ The trial judge's inspection with the consent of counsel is evidence in the case and "may be used alone or with other evidence to support the findings." (*McCarthy* v. *City of Manhattan Beach*, 41 Cal.2d 879, 889 [264 P.2d 932].) █ He merely applied his judicial knowledge to his own observations of the physical topography of the tract and the surrounding neighborhood.

Furthermore, the restrictions may be reasonably construed as not applying to taking oil, gas, and other mineral substances from under the property by slant drilling. The fact that the deeds state that the restrictive conditions are to be construed as covenants running with the land for the benefit of the other lots in the tract and the fact that the original grantor defaulted in this action, indicates that at the time the restrictions with respect to producing oil, gas, and other mineral substances were imposed, the parties did not have in mind the possibility of that sort of oil development, and did not intend to restrict the use of the properties for any purpose or for the benefit of anyone except to protect the tract for single-family residential use.

Should there be an oil pool under the tract and someone seek to tap it by directional drilling, there is no reason why interested owners in the tract cannot by mutual agreement remove or modify the restrictions in that respect; or, failing agreement, seek appropriate judicial relief. (See *Wilshire Oil Co.* v. *Star Petroleum Co.*, 93 Cal.App. 437 [269 P. 722].)

█ Lastly, defendants contend the trial court erred in refusing to consider and in excluding evidence of the present occupancy of the house on plaintiff Joseph H. Hirsch's property as a single-family residence to show its present suitability for that purpose. The point is predicated on comments made by the trial judge during the course of the trial. It has no merit. Defendants were not thwarted in their efforts to show suitability of the property for single-family residence

use or that it was occupied as such. There was evidence that since Hirsch acquired the property in 1945 it had been occupied as a residence. The trial judge viewed the property.

■ It is the findings of fact and the conclusions of law which constitute the decision of the court. Statements made or opinions expressed during the course of the trial do not constitute the court's decision. (*Southern Calif. Jockey Club, Inc.* v. *California etc. Racing Board,* 36 Cal.2d 167, 174 [223 P.2d 1]; *Beverly Finance Co.* v. *Superior Court,* 112 Cal.App. 2d 381, 386 [246 P.2d 142]; 48 Cal.Jur.2d 279, § 275.)

■ Defendants now state they were seeking to show that the house was not a multiple dwelling or a rooming house. But when the trial judge asked their counsel the relevancy of the evidence, he stated, "Just to show the suitability for residence purposes. Your Honor, people have been living there." There was evidence that the house was rented and occupied as a residence at and prior to the trial. It is clear from the record that no one thought it was a multiple dwelling or a rooming house. The record is replete with evidence offered for the purpose of showing whether the property was suitable for single-family residence use. And, as we have seen, the court in explicit terms found the property is "entirely unsuitable and undesirable for single-family residence use."

■ An equitable servitude is destroyed and enforcement will be denied when conditions have so changed that its original purpose can no longer be accomplished. (*Downs* v. *Kroeger,* 200 Cal. 743 [254 P. 1101].) As Dean Pound expresses it, "[W]hen the purpose of the restrictions can no longer be carried out the servitude comes to an end." (33 Harv.L.Rev. 813, 821. Also see 50 Harv.L.Rev. 171, 216.) The evidence abundantly supports the findings to the effect that the changed conditions which have occurred since the restrictions were imposed render it inequitable and unreasonable to enforce the restrictions limiting the use of plaintiffs' properties to residential purposes, and relieving plaintiffs therefrom. Further, the record shows that the original purpose of the restrictions can no longer be accomplished with respect to plaintiffs' properties.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 18, 1959.