456 P.2d 187

John D. MASON, Richard B. Perrenot, Roger P. Brown and Louise R. Kemp, Individually and composing the Cloudcroft Directory, and its official Board of Directors, Plaintiffs-Appellants,

v.

William E. FARMER, Defendant-Appellee.

No. 8627.

Supreme Court of New Mexico.

April 28, 1969.

Rehearing Denied June 6, 1969.

Garland, Martin & Martin, Mary Simpson Goggin, Las Cruces, for appellants.

Fettinger, Bloom & Overstreet, Alamogordo, for appellee.

OPINION

MOISE, Justice.

This proceeding was commenced by plaintiffs-appellants, as the owners of property in Cloudcroft or Place of Cloudcroft, as it is sometimes known, and as the "Official Board of Directors of the Cloudcroft Directory," against the defendant-appellee as purchaser under contract of Lots 10 and 11, Block 4, of Cloudcroft, seeking to enjoin defendant from operating a store thereon, alleging the same to be violative of certain restrictive covenants alleged to be applicable to said lots. After a trial, the court refused the relief sought and en-

tered its judgment dismissing the complaint. This appeal followed.

In order to determine if the trial court ruled correctly, it is necessary that we review the facts in some detail.

In the year 1900 the Alamogordo Improvement Company platted a tract of land in the Sacramento Mountains of Otero County, New Mexico. Thereafter, deeds were issued to the purchasers of lots, containing recitals setting forth the plan of development and operation of the subdivision. Included therein were provisions restricting the use of the land, to wit: "* * * that intoxicating liquors shall never be manufactured or sold as a beverage or as a medicine * * * upon said premises or any part thereof, * * * and that such premises nor any part thereof shall ever be used for immoral purposes or for purposes of trade or commerce, boarding houses and hotels excepted; * * *." *

In 1906, the Alamogordo Improvement Company filed an amended map of Cloudcroft for the stated purpose of adding to and extending the subdivision and to increase the area of land originally intended to be included. In the dedication it is stated that this was done:

"* * * under the same general scheme and plan for the purchase, use, control, government and enjoyment of owners of lots therein, or parts thereof, as are now existing and enjoyed by property owners in such original place of Cloudcroft, so that such original place of Cloudcroft, and the additions made hereby thereto, shall all be held, controlled, disposed of, enjoyed and managed, according to one and the same homogeneous and identical plan, * * *."

In the same year, the Alamogordo Improvement Company deeded to the Cloudcroft Company all of the property owned by it in Cloudcroft as shown by the amended map.

Following the description of the property conveyed, and as part of the habendum clause, the following is stated:

"* * * The second party; for itself, its successors and assigns, by the acceptance of the above conveyance of real estate and rights above described, hereby covenants contracts and agrees to and [with] the first party that it is familiar with the terms, stipulations, contracts and agreements contained in the usual form of deeds heretofore executed by the first party conveying Real Estate in said Place of Cloudcroft to purchaser thereof and that it hereby covenants and agrees to and with the first party, that in ownership, sale and disposition of any of the real estate situated within such Place of Cloudcroft, or adjacent thereto, it will sell, dispose of and transfer the same subject to like terms and conditions as those heretofore used and adopted by the first party and embraced in deeds executed by it as aforesaid, in so far as it is at any and all times practicable to do so."

It was further developed at the trial that all conveyances to property in Cloudcroft contained the restrictive language quoted above from the original deed to Lots 10, 11, Block 4.

Immediately to the north of Cloudcroft, separated therefrom by Burro Avenue, was North Cloudcroft, a dedicated tract without restrictions such as those imposed on Cloudcroft. In the early days a fence was maintained down the center of Burro Avenue, with a gate for vehicles, and one or two stiles for pedestrians, it being the intention that Cloudcroft should be maintained as a summer resort for the exclusive use of its residents and their friends and guests, free from vehicular traffic and the attendant danger to children. In addition, on Lot 3, there was built the Cloudcroft Lodge, a hotel for summer visitors, in connection with which services incidental to such an operation were available,

* A copy of the record of the original deed to Lots 10, 11, Block 4, is set out in the appendix following the opinion.

viz., dining facilities, a bar, curio shop, a bowling alley, and a theatre. The original Lodge burned in 1911 and thereafter was rebuilt in Block 30. A golf course with pro shop was also built.

In 1900, the area could be reached only by wagon road. Later, a branch railroad line was built to it from Alamogordo. The Cloudcroft Directory, established by the original deeds to serve as the governing body of Cloudcroft, maintained the fence, the park, the streets and roads, a modest police force and sanitary facilities and, in the winter, provided a guard or guards for the property. Money to pay for these services was raised through assessments levied and collected by the Directory. In the early days, deer and other animals were maintained in Zenith Park. There were few, if any, year-around residents. Residents would spend the summer months, generally from June to September, when schools were in vacation, and would close their houses for the balance of the year. During the summer, people would come and stay at the Lodge or boarding houses for longer or shorter periods of time.

With the passage of time, numerous changes have intervened. As already noted, the original Lodge burned and was rebuilt in Block 30. There are no longer any animals in Zenith Park and part of the Park has been conveyed for school purposes, and a school erected therein. The fence has long since been permitted to disappear and, whereas originally Cloudcroft was practically abandoned, except during the summer, there are now many people who live there the year around. The Place of Cloudcroft, together with other adjoining subdivisions have been joined and incorporated as the Village of Cloudcroft, controlled by a municipal board.

Contributing to the growth has been the improvement of the highway, formerly known as New Mexico Highway 83 but now being U.S. Highway 82. This road carries increasing numbers of tourists and commercial vehicles, including van-type trucks of the diesel variety. The railroad has been discontinued. Winter recreation, including skiing, has been added to the summer resort activities so that today the community is a year-around resort area, and there are numerous permanent residents to serve those seeking both summer and winter recreation, as well as the transients who travel the highways. The population of Cloudcroft was 251 persons in 1950. U.S. Bureau of the Census. U.S. Census of Pop., 1960 Vol. 1, Part 33, New Mexico. In 1960 it was 464. U.S. Census of Pop., 1960, supra. Today, as one witness testified, there are 600 "natives" of Cloudcroft.

The highway traverses the subdivision of Cloudcroft. It passes to the south of Block 1 and bisects Zenith Park, leaving part to the north and part to the south of the highway. Because Block 1 was separated from the balance of the subdivision and was no longer a physical part of it, but was more closely aligned with North Cloudcroft, the restrictive covenants previously pertinent to Block 1 (except the southeast corner held bound by the restrictions in Neff v. Hendricks, 57 N.M. 440, 259 P.2d 1025 (1953)) have been lifted by court decree following our decision in Mershon v. Neff, 67 N.M. 311, 355 P.2d 128 (1960).

Some of the changes that have taken place since 1900 have been detailed above. Our attention is also directed to the fact that immediately to the east of defendant's property and facing the highway is located Buckhorn Cabins with fifteen units which are rented by the day or week, summer and winter. Situated to the south are the Wayside Cabins, to the west is a Catholic Church. Directly across the highway, the Ski Inn, a restaurant, is operated. Only three blocks of the subdivision face onto the south side of the highway. They are blocks 2, 4 and 5. All of Block 5 facing the highway is occupied by Buckhorn Cabins, mentioned above. There is no other commercial operation in any of the three blocks except the store of defendant and,

on Block 2, a large commercial sign advertising the Lodge. All the property abutting the south side of the highway is now designated a commercial zone by the Village of Cloudcroft. With only one exception, none of the property immediately adjacent to Farmer's store is presently being utilized for residential purposes. Indeed, the owner and occupant of the residence lying west of the church testified that no one was interested in the highway property for such purposes, one reason being that the highway at this point is situated on an incline and that diesels make considerable noise pulling up the hill. Before defendant purchased it, improved it, and started the store which he now operates, the premises in question were used, successively, as a cafe, as a so-called "teen center" catering to children and selling candy and snacks, and as part of a cabin rental business.

Several motels, in addition to those already mentioned, with incidental operations such as restaurants, curio shops and other facilities of interest to tourists or those seeking summer or winter recreation, are located in the subdivision. There are a few instances of businesses or professions being conducted from individuals' homes in the restricted area. The telephone company has an office there, and there is a bowling alley and a cable television operation within the subdivision. The trial court concluded, insofar as material, as follows:

"10. That the immediate surround____ area to Defendant's business contains numerous violations of the restrictive covenants against trade and commerce, all of which has been allowed to exist without complaint from either the Board of Directors of the Cloudcroft Directory or any individual property owner in the restricted area of Cloudcroft."

"12. That the dominant estate which may be held by the Plaintiffs has not been injured of [or] damaged by the Defendant's present use of his premises for trade or commercial purposes, which is no different in character than has exist-

ed in the past and exists in the surrounding area."

"15. That it is not possible or practical to carry out the original purpose of the development of the Original Place of Cloudcroft as of 1906 by continuing the restrictions of use as far as the Defendant's premises is concerned."

"17. That it would be inequitable for the court at this time to attempt to enforce restrictive covenants against the Defendant's lots, when violations of the restrictive covenants have existed for many, many years upon said lots, as well as in the surrounding area."

Appellants, in their brief, argue that the court's application and interpretation of the covenants was in error in that "motels" of today should be considered as included within the term "boarding houses and hotels" excepted from the restrictions. Further, they assert that neither professional offices in homes, nor business incidental to, connected with, or conducive to a proper use of the property, constitutes trade and commerce prohibited by the restrictions. They also argue laches is not established without a showing of unreasonable delay and intentional acquiescence. A sub-point to the effect that there has been no such change of conditions sufficient to render the covenants unenforceable is argued in some detail and, in our view of the case, is decisive. We discuss it first.

Five elements are discussed. They are (1) the construction of the highway and increased travel; (2) the fact the property may now be more valuable for business purposes; (3) the finding of the trial court that enforcement of the covenants is not feasible; (4) the fact the property has been zoned as commercial; and (5) the claim that the presence of the covenants continues to have value to the other properties in the subdivision.

Without any intention of minimizing the particular matters outlined above, and discussed at some length in the briefs, we believe the answer to the problem can best be reached by considering the broad picture as

shown by the record. In other words, has there been such a change in Cloudcroft since the restrictions were imposed as to make their enforcement as against defendant inequitable? We first consider cases decided by us which may be of some assistance in arriving at a conclusion. In this connection, Neff v. Hendricks, supra, is particularly instructive. The case involved the same subdivision and the same restrictions with which we are not concerned. An injunction was sought and granted, prohibiting the use of a portion of Block 1 (divided from the rest of the subdivision by the highway) as a filling station for automobiles. The trial court found that as of 1951 there had been no abandonment or waiver of the general purposes and plan of the neighborhood so as to result in destruction of the benefits of the restrictions. We affirmed. We quote from the opinion the following discussion of the changes that had taken place to that time (1951):

"Appellants assert there has been a change in condition in the neighborhood which renders the restrictions without value to the area. It must be conceded there has been a decided change. In 1910, there were some 140 to 150 residential cottages in the area. Other substantial cottages and modern dwellings have been constructed. It now has all the conveniences of a city, yet is still free of the disturbances so common to business districts. The Southern Pacific has ceased to operate its rail lines in the area. The Bureau of Public Roads has extended a trans-continental highway into and across it. This highway crosses appellants' property but leaves a sufficient area for the construction of hotels and boarding houses. Obviously, these changes do not lessen the benefits of the restrictions. Rather, they enhance their value. * * *"

Mershon v. Neff, supra, a declaratory judgment action, raised the question of changed circumstances and conditions on Block 1 in 1957. The trial court declared the restrictions to be in full force and ef-

fect. On appeal, we reversed because the trial court erred in considering only the changes which had occurred between 1951, when Neff v. Hendricks, supra, was instituted, and 1957. We determined that the court should have considered the cumulative effect of changes from 1900, the date of the restrictive covenants, to the time the action was filed. Concerning changed conditions as found by the trial court, and other changes not considered by it, we had the following to say:

"The court in a memorandum opinion which it filed stated that appellants asserted four changed conditions as follows: (1) the new highway and increased activity along it catering to tourists, (2) an increase in permanent residents, (3) abandonment of the railroad which formerly served the town, and (4) the location of the highway so as to make Block 1 geographically a part of North Cloudcroft, and then concluded that these conditions all were in existence in 1951 when the previous case was heard, and that there had been 'no material increase in their impact on the community since that time.' This was incorporated in Finding 16, quoted above.

"The court did not note—at least he did not mention—the following additional facts proven to have occurred since 1953, which appellants assert must be considered along with the other changes which occurred before that date: (1) The highway has been paved with greatly increased traffic thereon, (2) conversion of the building on the southeast corner of Block 1 into a cafe, (3) construction of the City Hall on the property, (4) use of the property as a parking lot for the benefit of the businesses in North Cloudcroft and for trucks of all kinds, and (5) occasional use of the property for other commercial activities as for example a place from which milk was distributed by Price's Creameries for some two years. To say the least, these additional items should have been considered by the court together with changes present in 1951, and a determi-

nation made as to whether the restrictions should continue to be maintained on Block 1."

Following remand, it appears that the court removed the restrictions on Block 1, except for the southeast corner where Ski Inn is now located, this being the property involved in the 1951 case. As noted above, Block 1 is located directly to the north across the highway from the property here involved.

It is apparent from the two cases arising out of the very same subdivision as the instant case, and particularly from the language quoted from Neff v. Hendricks, supra, that we have recognized the importance of changed conditions and circumstances in deciding whether restrictive covenants have been waived, or should be enforced. We quote the following additional language from Neff v. Hendricks, supra:

"* * * [T]he evidence discloses that a picture show, bowling alley and pool room have been permitted to operate within the area, and that cigarettes, candy, chewing gum, and cold drinks are dispensed at the bowling alley. The operation of these places and the sale of the articles mentioned are not disputed and form the basis of appellants' assertion that a waiver of restrictive covenants has been effected. We cannot agree with this contention. These things being minor and trivial, do not suggest an intent by the common owner or its assigns to waive the restrictions. Alamogordo Investment Co. v. Prendergast [45 N.M. 40, 109 P.2d 254], supra. They merely support the purpose of the general plan, that is, the entertainment and amusement of home owners, their families and visitors."

Even more directly in point is the language found in Chuba v. Glasgow, 61 N.M. 302, 305, 299 P.2d 774, 776 (1956), where we said:

"* * * [W]here changes in the surrounding area are so radical as to frustrate the original purposes and intention of the parties to such restrictions, that they can no longer be carried out, and this without fault or neglect of him who seeks to be relieved by a court of equity from their observance, such restrictive covenants should be extinguished. In such instance the doctrine, as expressed in the maxim lex non cogit ad impossibilia, would apply; * * *."

In Alamogordo Improvement Co. v. Prendergast, 45 N.M. 40, 46, 109 P.2d 254, 257 (1941), we said, "Change of conditions, to warrant the court in refusing equitable relief, must be of such importance as to amount to a defeat of the purpose of the restraint * * *." See Annot. 4 A.L.R. 2d 1111; Berry, Restrictions on Use of Real Property, § 403 (1915). Compare Williams v. Butler, 76 N.M. 782, 418 P.2d 856 (1966); Wolff v. Fallon, 44 Cal.2d 695, 284 P.2d 802 (1955); Hirsch v. Hancock, 173 Cal.App.2d 745, 343 P.2d 959 (1959); Bolotin v. Rindge, 230 Cal.App.2d 741, 41 Cal.Rptr. 376 (1964); Paschen v. Pashkow, 63 Ill.App.2d 56, 211 N.E.2d 576 (1965). We quote the rule as stated by the California Supreme Court in Wolff v. Fallon, supra:

"The trial court, after making detailed findings as to changes which had occurred in the neighborhood since 1913, found and concluded that plaintiff's lot was not now suitable or desirable for residential use but was essentially business property, that its use for commercial purposes would not detrimentally affect the adjoining property or neighborhood and might be beneficial, and that, by reason of the changed conditions in the neighborhood and present character of the block, enforcement of the restrictions would be inequitable and oppressive and would harass plaintiff without benefiting the adjoining owners. The findings, if supported by the evidence, warrant granting relief from the restrictions."

We could extend the discussion but are satisfied with the rules as above set forth. They are appplicable when changed

circumstances have made the restrictions obsolete and when it would be inequitable to the property owner to deny him relief while at the same time no benefits to the remaining lots would result from enforcement. The trial court has found the property in question to be no longer suitable for residential purposes; that the changes that have occurred over the years have resulted in such altered conditions as to make it inequitable to longer enforce the restrictions against the lots in question; and, also, that to grant the relief sought will not in any way hamper the full enjoyment for residential purposes of other properties in the subdivision. The proof upon which these ultimate facts, as found by the court, are based has been set forth by us with some particularity. These findings unquestionably have substantial support in the evidence. They are not in any sense inherently improbable and accordingly will not be disturbed by us. Kutz Canon Oil & Gas Co. v. Harr, 56 N.M. 358, 244 P.2d 522 (1952); Gorman v. Boehning, 55 N.M. 306, 232 P.2d 701, 26 A.L.R.2d 868 (1951).

Appellants argue the restrictions should be maintained so that the property on the south side of the highway will stand as a buffer between the encroaching commerce from north of the highway and the clearly residential property south of it. In effect, the argument is that a line must be drawn somewhere, else the restrictions on all lots will collapse like tenpins.

As an abstract legal proposition, the position may have merit [See 5 Powell, Real Property, § 684 (1968); but cf. Atlas Terminals, Inc. v. Sokol, 203 Cal.App.2d 191, 21 Cal.Rptr. 293 (1962)]. Under the facts here present we are not impressed with the argument. After the passage of more than 60 years since the restrictions were imposed, whatever the impetus for commercial growth southward from the highway, it originates, we believe, from the changes in the times, including the highway with its attendant noise and danger, and the various commercial enterprises already in existence in the vicinity. These conditions obtain, apart from the Farmer store. Restricting Farmer's property to an assertedly permissible use, such as a motel or a motel-restaurant combination, would not make the surrounding area any the more desirable for residential use, nor, in any other way, further the original purposes of the restrictions.

We do not hold, or suggest, that economic considerations alone justify removal of restrictions, or that increased traffic on an abutting street is determinative, compare H. J. Griffith Realty Co. v. Hobbs Houses, Inc., 68 N.M. 25, 357 P.2d 677 (1960); Chuba v. Glasgow, supra; however, that these are proper elements to be considered cannot be doubted, see Wolff v. Fallon, supra; Hirsch v. Hancock, supra; neither does the fact of commercial zoning operate, of itself, to alter valid restrictions, Hirsch v. Hancock, supra; Mohawk Containers, Inc. v. Hancock, 43 Misc.2d 716, 252 N.Y.S.2d 148 (1964); nevertheless, it is some evidence of purposes for which the property is suitable, Bard v. Rose, 203 Cal.App.2d 232, 21 Cal.Rptr. 382 (1962). The pronouncements herein apply only to the two lots in issue and not to any additional property, except as the principles which we here announce may be applicable. We make this statement because of the fears expressed by appellants that an affirmance of the judgment will be an opening wedge for widespread violations of the long-standing covenants in Cloudcroft and might well be followed by a general disregard thereof.

In our view, our disposition of the point discussed, without consideration of additional arguments advanced, requires that the trial court's judgment be affirmed.

It is so ordered.

CARMODY and TACKETT, JJ., concur.

NOBLE, C. J., and COMPTON, J., dissenting.

Appendix

Book 3   Page 25

# DEED.

New Mexican Printing Company, Printers, Binders and Blank Book Makers, Santa Fe, N. M.

The Alamogordo Improvement Company

TO

*Albert Walker*

TERRITORY OF NEW MEXICO,
County of Otero.

I hereby certify that this instrument was filed for record on the 19th day of October A. D. 19— at 10 o'clock —. m., and was duly recorded on this day of

A. D. 190—

*H. K. Stalcup*

Probate Clerk and Ex officio Recorder.

Deputy.

WHEREAS, The Alamogordo Improvement Company, a corporation organized under the laws of New Mexico, the first party, heretofore acquired the ownership of that certain real estate, designated and known as Cloudcroft, which is represented as being subdivided into lots, blocks, streets and alleys, by that certain map filed in the office of the Probate Clerk and Ex-Officio Recorder of Otero County, New Mexico, on the thirtieth day of April, 1900, and contemplates the acquirement and subdivision into lots, blocks, tracts, streets and alleys, of other real estate contiguous thereto and within the exterior limits shown and represented on said map so filed, and the sale and disposition of such property for purposes of homes and for resort, and with the view of having same at all times controlled along police and sanitary lines and in the matter of streets, alleys, parks and highways and in the public improvement thereof, by the owners of property therein, and for such purpose has adopted the plan for the government thereof as are hereinafter recited. And.

WHEREAS, the first party has agreed and hereby agrees with the second party and the heirs and assigns thereof, that all of the lands now owned and so represented as being subdivided on said map, and also all other lands contiguous thereto within the exterior boundaries of said entire tract as represented on said map, which may be hereafter acquired and conveyed by the said first party, shall be sold and conveyed upon the same terms, conditions and restrictions hereinafter named and required of the second party, except that the restrictions against horses, cows, mules, domestic animals and fowls shall not apply in any of that territory lying south of the center of Chautauqua Canon or east of a north and south line passing through the junction of said Chautauqua Canon and Cloudcroft Canon and north of the third correction line, and also except that the first party herein reserves the right to manufacture, sell or dispose of intoxicating liquors upon blocks one, two and three as represented on said map, or to authorize or permit other persons so to do, but has agreed and covenanted to and with the second party that it will not itself exercise such right or permit or authorize any one else so to do upon any other of the property now owned or which may be hereafter acquired by it within the exterior limits represented on said map.

NOW, THEREFORE, for and in consideration of the premises and of the sum of *Two hundred fifty & no/100* ———————— Dollars, to it in hand paid, by the second party, the receipt whereof is hereby acknowledged, and also in consideration of the covenants and agreements of the second party to be binding upon the second party and all persons deriving or claiming any interest, claim or title from or subsequent to said second party, and which covenants and agreements are hereby made with the first party and all persons who heretofore have, or hereafter may derive title through the first party or its successors to any real estate contained in Cloudcroft, that a fence may be maintained by the first party or the property owners, on the north boundary line of South Burro Avenue and separating the same from North Burro Avenue in North Cloudcroft, and such other fences in and about Cloudcroft as the Directors hereafter provided for shall establish, and that intoxicating liquors shall never be manufactured or sold as a beverage or as a medicine or otherwise disposed of in any place of public resort upon said premises or any part thereof, and that no horses, mules, burros, cows, sheep, goats, swine or any other domestic animal, or any fowl shall ever be kept upon any portion of such premises unless the tract hereby conveyed is outside of the boundaries heretofore defined within which the keeping of such animals is prohibited; and that such premises nor any part thereof shall ever be used for immoral purposes or for purposes of trade or commerce, boarding houses and hotels excepted; and also in consideration of the covenant and agreement of the second party that the second party and the heirs, successors and legal representatives and all persons subsequent in interest thereto, shall possess, hold, enjoy, use, own and control said premises and every portion thereof subject to a compliance with the rules, regulation and restriction which may be provided, adopted or determined for the enforcement of police and sanitary purposes or the improvement, regulation or control of streets, alleys, parks and highways by the Directors hereafter provided for, and also well and truly pay as required by such Directors or the property owners within Cloudcroft, all taxes, assessments or charges duly assessed, levied, or determined upon by such Directors or property owners, in aid of, or for the purpose of carrying into effect such police and sanitary purposes, or for the improvement or regulation of said streets, parks, alleys or highways, in the manner and way herein recited, has granted, transferred and conveyed and by these presents does grant, transfer and convey unto *Albert Walker* of *Cloudcroft N. M.*, the second party, and the heirs and assigns thereof forever, the following described real estate lying and being situated in the said tract known as Cloudcroft, in the County of Otero, and Territory of New Mexico, viz:

*Lots ten (10) and eleven (11) in block number four (4)*

according to the map of said tract adopted by said first party and so filed in the office of the Probate Clerk and Ex-Officio Recorder as aforesaid, reserving however therefrom a right of way for a pipe line for carrying water over and across said land, and to at all times enter thereon to construct or maintain the same.

Together with the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining.

TO HAVE AND TO HOLD, the premises above conveyed unto the second party, the heirs and assigns thereof forever, subject, however, to a full compliance with the foregoing covenants, restrictions and agreements with reference to the manufacture and sale of intoxicating liquors thereupon, and to a compliance with said covenant with reference to the non-use of such property for business or immoral purposes or the keeping of animals or fowls thereupon, and the covenant and agreement of the second party with reference to a compliance with such rules and regulations and the payment of taxes and assessments determined or levied by such property owners' organization for police and sanitary purposes and the improvement and control of streets, highways, parks and alleys; and such property and all interest of the second party or any person subsequent in ownership or interest shall be and become forfeited and absolutely revert to said first party or its successors, in event the second party or any one subsequent in interest or ownership thereto shall violate any of the conditions herein imposed and above recited with reference to intoxicating liquors or the keeping of stock or fowl upon said premises, or the use of the same for business or immoral purposes above prohibited, or in event the second party or any one subsequent in interest thereto shall fail, neglect or refuse to comply with all rules and regulations provided by the Board of Directors, or adopted by the organization of property owners, or fail in accordance with such rules and regulations to pay the assessments or taxes which may be levied by such directors of such organization, for sanitary or police purposes, or for the improvement of streets, highways, parks or alleys when so made, adopted, imposed or levied by such organization or the directors thereof as hereinafter provided. And it shall be lawful for the first party or its successors to enforce such forfeiture at any time after the party in ownership shall have become liable thereto, and the failure to enforce the same at any time, on account of any violation of any such covenant, shall not preclude the first party from enforcing the same for any subsequent violation thereof, provided that before at any time proceeding to enforce such forfeiture on account of such violation, the first party shall give due notice to the party in ownership of its intention to enforce such forfeiture in event the party in ownership shall not immediately take proceedings to and completely comply with the obligation, the violation of which gave such right of forfeiture. And in event such party shall comply with said obligation within sixty days after such notice shall be given, no such forfeiture shall be enforced.

It is further provided by the first party, and agreed to by the second party, that the affairs of property owners above referred to, shall be determined, governed and effected in the following manner, to-wit:

There shall be five directors, three of whom shall be known as "Company Directors" and two known as "Property Owners Directors," but until the year 1901 all such directors shall be selected and appointed by the first party. Subsequent to the beginning of the year 1901 and until the close of the year 1910, three of such directors shall be appointed by the first party, or its successors, and two of the same shall be elected by ballot by the owners of property within Cloudcroft, and subsequent to the close of the year 1910 all such directors shall be elected by the property owners within such place. Such directors shall constitute the governing board of Cloudcroft. They shall have power to adopt and from time to time to amend as provided by them, by laws and rules for the government of themselves and their successors and to select officers of the board and their agents and employes and to provide compensation therefor; to adopt rules and regulations providing sanitary and police rules, measures and regulations and fines for the violation thereof, and also to adopt rules and regulations for the control and use of the streets, parks, alleys, roads and highways in said place, and also to determin upon, adopt and carry into effect the grading or improvement of any such highways, parks, roads, streets or alleys, and for any one or all of such purposes they shall have power from time to time to levy and assess against each property holder in said place a tax or amount for the contemplated cost or expense thereof, and such assessments when made shall become and be binding upon the second party and all other property owners in said place, and constitute and serve as a mutual agreement between same and a specific agreement as against each thereof to pay the same as required by said directors; but in event any director shall dissent from any rule adopting any rule, regulation or other action which has the effect of imposing upon such property owners any tax or assessment, such action must be ratified by a majority rate of the then property owners before the same becomes binding, and when so ratified by a majority vote thereof the same shall become and be binding upon and serve as an agreement of each property owner to pay the same as required thereby. And the directors shall prescribe the rules and regulations for the holding of such elections and voting upon questions of taxes, and of each election or ballot at least thirty days notice shall be required. Three directors shall constitute a quorum for the transaction of business. Each owner of a lot or tract within the boundaries of such place as shown on such map or amendment thereof as at any time so subdivided and platted, shall be entitled to vote at all elections of directors and upon all subjects referred to such property owners for their decision. The directors appointed by the first party shall hold their respective offices for such length of time as the first party may from time to time determine, but the directors elected by the property owners shall be elected for one year to serve for the ensuing year, or as the by laws may determine, and property owners or directors can vote by proxy at any election or upon any specific question at the respective meetings, upon thirty days written notice, and directors shall provide that such written notice be given to each qualified voter, reciting all questions to come before the meeting thirty days in advance.

IN WITNESS WHEREOF, the first party has caused its corporate name to be subscribed and its corporate seal to be affixed hereto on this the day and year first above written. 1st Oct, 1901,

ALAMOGORDO IMPROVEMENT COMPANY,

ATTEST:

Geo B

By E. M. Master
Transfer Agent,

By A. J. King, asst Secretary.

TERRITORY OF NEW MEXICO, } ss.
County of Otero.

On this the 1st day of October A. D. 1901, before me appeared E. M. Master Transfer Agent to me personally known, who being duly sworn did say that he is the of the Alamogordo Improvement Company, the corporation mentioned as grantor in the foregoing deed, and that the seal affixed to said instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said E. M. Master acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on this the day and year first above written.

Carl Kuber
Notary Public in and for said County and Territory.

NOBLE, Chief Justice and COMPTON, Justice (dissenting).

Believing that the majority have failed to correctly apply well-established legal principles to the undisputed facts of this case, we find ourselves unable to agree with either the disposition of this case by the majority, or the reasoning by which they reach their result.

Courts have generally used one of two theories in refusing to enforce restrictive covenants—either (1) a presumption that the parties intended that the covenant terminate when the purposes for which it was designed could no longer be accomplished; or (2) by applying the balancing-of-interests approach where because of greatly changed conditions, enforcement of the restrictive covenant would not only not benefit those seeking enforcement of the restriction but would also inflict serious hardship on the one seeking to abolish the restriction.

The majority construe our decisions as falling within the latter classification. See Chuba v. Glasgow, 61 N.M. 302, 299 P.2d 744, where we said such restrictive covenants should be extinguished where the changes in the surrounding area are so radical as to frustrate the original purposes and intention of the parties so that they can no longer be carried out. Compare Neff v. Hendricks, 57 N.M. 440, 259 P.2d 1025, where we affirmed the judgment of the lower court enforcing the restrictive covenants applicable to Block 1 in Cloudcroft. See also Mershon v. Neff, 67 N.M. 311, 355 P.2d 128, where the restrictive covenants (except the southeast corner held bound by the restrictions in Neff v. Hendricks, supra,) were removed. It will be noted that in Mershon v. Neff, Compton, then Chief Justice, dissented and Noble, Justice, did not participate.

A leading case almost identical with the facts of the instant case is Continental Oil Co. v. Fennemore, 38 Ariz. 277, 299 P. 132, where, even though the streets surrounding the restricted residential area had become important traffic arteries, the court was unwilling to find the changes so radical as to frustrate the intention of the parties, or to justify violating the restrictions. It is the general doctrine that one lot cannot be considered separate and apart from its relation to the entire restricted area. Those who have bought lots in reliance on the restrictive covenants are entitled to protection against prohibited invasion regardless of how close business may crowd around them. Swan v. Mitshkun, 207 Mich. 70, 173 N.W. 529, and the fact that adjoining or surrounding property is now used for business does not alter the right of property owners to have it preserved for the purposes for which they must be presumed to have purchased it. See the great weight of authority cited in Continental Oil Co. v. Fennemore, supra. Compare Trustees of Columbia College v. Thacher, 87 N.Y. 311, where the tract in downtown New York was entirely surrounded by business and an elevated railway station was located directly in front, rendering privacy and quiet impossible.

In our view, the great majority of the courts require satisfactory proof that conditions have so changed as to frustrate the intention of the parties in creating the restrictive covenants and proof that the subdivision, by reason thereof, is no longer valuable as a residential tract. See the cases cited in the excellent discussion of the question in Note, 11 N.Y.U.Inter.L. Rev. 87, 94–96. See also Note, 45 Ky.L.J. 292, 297–300, which discusses five factors to consider in determining whether the benefits sought can be substantially secured. See also Restatement of Property § 564, saying that courts will refuse to enforce such restrictive covenants only if conditions have so changed as to make it impossible longer to secure in a substantial degree the benefits intended to be secured by the performance of the covenant.

In our view, the majority have fallen into the same error as did the trial court, in that they find substantial support for the finding of the trial court that enforcing the restrictions against the two lots in-

volved in this action would not benefit the remaining lots. Even if that be true, the rule is that all of the lots must be considered. Continental Oil Co. v. Fennemore, supra. When the correct rule of law is applied, the finding lacks substantial support in the evidence. The changes here are essentially located in the residences in which the people live. The changes in this case are entirely minor in character. It is apparent to us that the intent of those imposing the restrictive covenants was to except from them and to permit, without restriction or violation, those things necessary or convenient to tourists or vacationers. Motels and restaurants would seem to come within the express exception of hotels and boarding houses. Certainly the absence of the fence, the erection of a school in the area, and the fact that the people now live there the year around instead of only in the summer months, are not such radical changes as to frustrate the intention of the parties.

The effect of the action of the majority today is to open the door to all lots in the blocks fronting on the highway and by association to next extend to the properties in the adjacent blocks so that, in a short period, by extensions alone, the restrictions will be removed from the entire restricted tract. See Note, 11 N.Y.U.Inter.L.Rev. 87. As a matter of fact, in our view the change in location of the highway forms the real basis for the majority opinion.

We are likewise unable to agree with the theory by which the majority, without citation of authority, reject the buffer zone doctrine. In our view, refusing to enforce the restrictions in the block immediately north of the new highway, as was done in Mershon v. Neff, supra, established that as a buffer zone. Removal of the restrictions affecting the block immediately south of the highway will ultimately result in such removal in adjoining blocks to the south.

Believing that such restrictive conditions are imposed as a protection to purchasers of real estate, we believe the great majority of the better reasoned decisions require

their enforcement unless conditions have so radically changed that they simply cannot be enforced. For these reasons, we feel that the judgment appealed from should be reversed and, accordingly, dissent from the majority opinion.

COMPTON, J., concurs.